[S.F. No. 22727. In Bank. Feb. 25, 1971.]

WILLIAM HERBERT M. GREENE, Petitioner, v.
COMMITTEE OF BAR EXAMINERS, THE STATE BAR OF
CALIFORNIA, Respondent.

COUNSEL

William Herbert M. Green, in pro. per., for Petitioner.

F. LaMar Forshee and David B. Lynch for Respondent.

OPINION

**THE COURT.**—William Greene requests review of the action of respondent in refusing to certify him for admission to practice law in this state. (Bus. & Prof. Code, § 6066.)

Greene, now 32, was admitted to practice in Illinois in May 1963 and in

Nevada in October 1968. In November 1968 he filed with respondent an application as an attorney applicant for admission to practice in California, and in March 1969 he passed the California attorneys' examination.

Thereafter, hearings were held by respondent's subcommittee with respect to Greene's moral character and the question whether he had fulfilled the practice and residency requirements requisite to his certification.[1] The subcommittee subsequently filed with respondent a report containing its findings and conclusions, unanimously determining therein (1) that Green had not fulfilled "the residency requirement" or "the practice requirements" and (2) that he was not possessed of good moral character. Greene filed with respondent objections to the report.

Respondent, after considering the report, the objections thereto, the record of the proceedings before the subcommittee, and oral argument, unanimously approved the report, adopted the findings and conclusions contained therein, and concluded that it could not certify that Greene had fulfilled the requirements for admission.

As stated by this court in *Bernstein* v. *Committee of Bar Examiners,* 69 Cal.2d 90, 97 [4, 5] [70 Cal.Rptr. 106, 443 P.2d 570]: "Respondent's findings are not binding upon this court but are entitled to great weight, and the burden of showing that the findings are not supported by the evidence or that respondent's action is erroneous is upon the peti-

---

[1]At the time Greene filed his application, section 6062 of the Business and Professions Code provided: "To be certified to the Supreme Court for admission, and a license to practice law, a person, who has been admitted to practice law outside of this state, shall:

" . . . . . . . . . . . . .

"c. Be of good moral character.

"d. Have been a bona fide resident of this state for at least three months immediately prior to the date of his examination and continuing to and including the date of his admission.

"e. Have been admitted to practice before the highest court of a sister state . . . and (1) have been actively and substantially engaged in the practice of law *in any such jurisdiction* . . . for at least four years out of the six years immediately preceding the filing of his application for admission to practice in this state or (2) demonstrated to the satisfaction of the examining committee that his experience and qualifications qualify him to take an examination. . . .

"f. Have passed such examination as in the discretion of the examining committee may be required." (Italics added.)

Even under the alternative provision set forth above with respect to the practice requirement, an attorney applicant must show that he has been actively and substantially engaged in the practice of law for at least four years at some stage of his career in a jurisdiction where he has been admitted to practice before the highest court. (See rule IV, § 41, Rules Regulating Admission to Practice (Bus. & Prof. Code, foll. § 6068), adopted by respondent pursuant to its authority to adopt such reasonable rules as may be necessary or advisable for the purpose of making effective the statutory requirements (Bus. & Prof. Code, § 6047).)

tioner. This court examines and weighs the evidence and passes upon its sufficiency, and any reasonable doubts are resolved in favor of the petitioner."

Greene now impliedly admits that he did not have the required four years' experience in the practice of law under respondent's interpretation of the statute; and the residence requirement was deleted by the Legislature in 1970. Accordingly, the sole question for this court's determination is whether or not Greene has shown that he has the requisite good moral character, and the evidence with respect to his representations regarding his residency and practice will be discussed only as they have a bearing on the issue of his moral character.

■ The burden of proving good moral character is upon the applicant, who must initially furnish sufficient evidence of good moral character to establish a prima facie case. The committee then has an opportunity to rebut such showing with evidence of bad moral character. (*Bernstein* v. *Committee of Bar Examiners, supra,* 69 Cal.2d 90, 95 [2].) A prima facie case of Greene's good moral character appears to have been made by evidence of his admission to practice in Illinois and Nevada and by a number of favorable letters of recommendation. Respondent does not argue to the contrary, but, in effect, asserts that the prima facie case was rebutted by the following matters:

*Assertedly False Statements on California Application*
*Regarding Residency*

On his California application, Greene showed residence in Chicago, Illinois, from June 1958 to April 1966; residence in Reno, Nevada, from April 1966 to date; and residence in San Francisco, California, from June 1968 to date. In an action filed in the United States District Court for the District of Nevada in September 1968 (to which further reference will hereinafter be made), Greene represented that he was a resident of Nevada, and he continued to so represent in documents filed therein as late as April 1969. On his application to take the Nevada bar examination, Greene showed residence in Paris, France, from April 1965 to April 1966, but no reference was made to such residence on his California application. The evidence also showed that he had written letters indicating that he intended to remain in California only until he had taken the bar examination and would then return to Reno and spend all of his time there except when traveling.

On his California application, in stating the facts on which he based his claim that he was a California resident, Greene stated, "I am physically

present in San Francisco, where I have been living since June of 1968." There is other evidence that he thought physical presence in California was sufficient to satisfy the residence requirement for purposes of qualifying to take the bar examination and that he believed he could have dual residence, that is, part-time residence in one state and full-time in another. For instance, his showing on his application that he had been a resident of Reno from April 1966 to the date of his application and a resident of California from June 1968 to such date constitutes some substantiation of his claimed understanding that physical presence here was all that was required. He further points to a letter found by respondent to have been written by him in January 1969 to an attorney, stating, in part: "California requires a three month 'Physical Presence' prior to taking of the examination which I am satisfying by studying here during December, January and February. The California requirement is nothing like . . . Nevada's and my domicile remains Nevada." The record shows that, in any event, on October 30, 1968, Greene executed a lease on an apartment in San Francisco for a one-year term commencing December 1, 1968, and that he subsequently purchased a 25-room home on Pine Street which he renovated and in which he is now living.

There is an inconsistency in Greene's maintaining that he considered that "residence address" meant physical presence and his failure to show his Paris residence on his California application. However, he indicated that he was doing a great deal of traveling during that period and did not actually have a fixed place of abode.

 As previously noted, reasonable doubts must be resolved in the petitioner's favor (*Bernstein* v. *Committee of Bar Examiners, supra,* 69 Cal.2d 90, 97 [4, 5]), and it would appear that reasonable doubt exists here.

*Omission of (1) Attendance at New York University Law School and (2) Application to Take the New York Bar Examination*

Under a question on his California application asking for information pertaining to his legal education, Greene omitted his attendance at New York University Law School, which attendance was from September 1958 until January 1959. At that school, he received unsatisfactory grades in two courses and no grades in two other courses.

Question 13 on the California application reads: "State every application for admission to the bar of any jurisdiction made by you EXCEPT those covered by your answer to Question 12 [relating to jurisdictions in which the applicant had been admitted to practice], the disposition made

of each such application, and the reasons therefor." Greene answered that question: "No other applications were made by me."

In 1962, Greene made an application to take the New York bar examination, but he later withdrew it. He made a further inquiry regarding taking the New York bar examination in 1963, but did not thereafter take it or apply for admission to practice in New York. He testified that when he filled out his California application, he had no recollection of attending law school at New York University or of applying to take the New York bar examination. Respondent concluded that Greene omitted the foregoing matters "in knowing disregard of the truth, believing that omission to be to his advantage."

Greene asserted in his objections that there was no reason for him to conceal those matters. Respondent suggests no such reason, but merely alleges that its conclusion was "reasonable." ■ Unintentional nondisclosure of relatively unimportant matters does not justify exclusion from the bar (*Hallinan* v. *Committee of Bar Examiners,* 65 Cal.2d 447, 473 [55 Cal.Rptr. 228, 421 P.2d 76]), and, as far as appears from the report and the briefs, the nondisclosure here in question would seem to be of that character.

### Assertedly False Statements on California Application Regarding Practice

As hereinabove indicated, in order to qualify as an applicant for the California attorneys' examination, Greene was required to show that he had been actively and substantially engaged in the practice of law for at least four years in a jurisdiction, such as a sister state, where he had been admitted to practice before the highest court. He was so admitted to practice in Illinois on May 23, 1963, and in Nevada on October 14, 1968.

Greene stated in his California application (filed in November 1968) that he had been actively and substantially engaged in the practice of law since 1960 as a law clerk and in practice for himself and with his father. As to the nature of that practice, he stated, "Specialty is and was—Corp. Reorganizations, Real Estate & Probate." He also stated, "I was & still am associated with my father at this office [54 W. Randolph St.] in Chicago."

After answering negatively question 15 ("Have you ever been engaged in any occupation, business, or profession *other than the law?*"), Greene wrote, in the space provided for listing employers in any occupation, business, or profession other than the law: "Never had any employment after being admitted to Illinois Bar outside of the services to lawyers rendered

by American Equities Group, Inc. of which I am the sole stockholder. See attached Dun & Brad report for a full report on these activities. (Next page)."

Greene's activities, as shown by the findings, included the following:

(1) From 1960 (i.e., before the completion of his legal education or admission to practice) to the date of the hearing, Greene engaged in a business that became known as "American Equities Group, Inc." (hereinafter called "American"), through which for a fee he undertook to locate persons such as lost stockholders or heirs.[2]

(2) In addition to the foregoing employment, Greene after his admission to practice in Illinois, either alone or in association with other attorneys, devoted "a small portion of his time to the practice of law as follows: [71 matters are then specified[3]]."

(3) Beginning in 1965, Greene also engaged in other business activities throughout the United States in jurisdictions in which he was not admitted to practice and in foreign countries.

(4) He also managed his own investments from 1960 on, as indicated by his responses on the Nevada application hereinafter set forth.

Respondent found, among other things, as follows:

In 1967 in connection with American a complaint was registered against Greene with the American Bar Association. Following an investigation, its Professional Grievance Committee concluded that "The business operated by Mr. Greene and the activities which he undertakes, are not considered to be the practice of law . . ." and for that reason found no basis upon which to take further action.

In his application for the Nevada bar, filed in January 1968, Greene, in response to question 39 ("Have you engaged in the practice of law in

---

[2]Greene testified: "[I]n the article [*Reader's Digest* article referring to the operation of Greene's company and similar tracers] . . . I emphasize: 'Go and see your lawyer. I don't want anyone dealing with me directly, if possible.'" He also testified: ". . . I am not really an heir-tracer. I am more of a stockholder-tracer. . . . 99.99 percent of the work [of American] is in finding lost stockholders for corporations. . . . So 'heir tracing' implies a lot of working with estates, which I do once in a great while, when an administrator or a court tells me to."

[3]The 71 matters are "four minor criminal cases, two domestic relations cases, 12 real estate matters, mostly small closings, one divorce case that reconciled, two contract disputes, one workmen's compensation, 10 wills prepared, about five contracts or leases, two corporations formed, creditors represented five times in bankruptcy proceedings, one liquor license board proceeding, two zoning variances, two property tax appeals, three building permits, one partition suit, and about 20 income tax preparations."

another jurisdiction?"), stated "no" and in the space provided for additional information inserted, "Never practiced law." In response to question 27 on the Nevada application relating to his prior employment, Greene listed employment during 1960 as a law clerk by Kronenberg [in Chicago] and self-employment from 1960 to date, described as "Management of personal investments, real estate, securities, etc." He further stated: "During the period from about 1960 onward, I acquired a good reputation as a tracer of 'lost' stockholders. . . . The company formed to handle this business was styled American. . . . *No legal work was ever performed by me or my staff. . . .*" (Italics added.) In response to question 29 on the Nevada application, asking whether the applicant had ever been self-employed in a business or profession and if so "when, where, and in what kind of business or profession," Greene replied "Yes" and provided the following detail: "As previously indicated, since 1960, I have been self employed, the main activity (commercial) being the management of my personal investments."

Following his admission to practice in Nevada and three days before the filing of his California application, Greene wrote the Nevada Bar that his answer to question 39 should have been affirmative rather than negative, in that his activities in connection with American "although mainly outside of the courtroom, were law related in a very direct way; but not violative of any of the canons of ethics."

Greene was given a choice between taking the attorneys' examination or the general bar and decided to take the former, because he believed it was easier.

Respondent concluded that Greene's answers on the applications he filed in Nevada and California were "knowingly and deliberately inconsistent," that he "answered each question in the manner which he believed would be most advantageous to him, without regard to the truth," and that his practice before October 1968, when he was admitted to practice in Nevada, was not of an active and substantial nature.

Greene testified that at the time he filled out the Nevada application he considered practicing law as trial work, and he therefore gave a negative answer. He also indicated that as he was filling out his application for the California attorneys' bar examination he concluded that an experience requirement was what was meant here and that to avoid any inconsistency he should amend his Nevada application to show that he had practiced law but make it clear that he had not engaged in any *unauthorized* practice of the law.

Greene calls attention to the fact that he attached a Dun and Bradstreet report to his California application, and he asserts that "no information

was concealed in California." The Dun and Bradstreet report, however, merely described the activities of American and was not inconsistent on its face with Greene's statement on his application that he had been actively and substantially engaged in the practice of law for eight years.

Greene also asserts, "My definition was that the four out of six year practice of law for the California attorney's bar exam was an *experience* requirement." However, his application did not show that he used the phrase "actively . . . engaged in the practice of law" to include experience apart from conventional law practice, unless an inference to that effect can be made from his representation that he became a law clerk commencing in 1960, which was three years before he was licensed to practice law.[4]

As indicated above, Greene stated on his application, "I was & still am [November 1968] associated with my father at this office [54 W. Randolph St.] in Chicago." His claim of having practiced in association with his father is weakened by the fact that he not only did not refer to any such association or employment on his Nevada application but represented therein that he had never engaged in the practice of law in another jurisdiction and that since 1960 he had been self-employed, his main activity being the management of his personal investments.

In addition, the evidence with respect to Greene's residency shows that he left Chicago in 1965 (only two years after he was admitted to practice in Illinois) to spend a year in Europe, returning for about a week in April 1966. Since that time, aside from taking various trips, he has allegedly resided continuously in Reno or San Francisco. Furthermore, he testified, "I haven't paid dues [state bar] in Illinois since I left, 1964," and stated that the last date he charged a fee to anybody in Illinois was 1965.

Under the circumstances, Greene's statement regarding his having been

---

[4]Greene contends that his work on legal matters pertaining to his own domestic problems (which will be hereinafter referred to) should be considered practicing law. He testified: "I have been having big discussions with fifty or sixty attorneys for the last seven years over this case every week. Several hours a day I have been laboring on this case. . . ." He further stated: "And this very same Schonblum case I have been spending about twenty hours a week on since it began in law libraries wherever I happen to be, trying to negotiate settlements, preparing sample pleadings, et cetera. . . . And I maintain that my work on the case should be accepted as practice of law because I'm doing my own legal work, and I'm certainly one of the great experts on conflicts of law, annulments and related matters, declaratory judgments."

Not only did Greene make no such claim in outlining his alleged active and substantial practice of the law, but, as will hereinafter appear, he failed to list the litigation in answer to question 19 (a), which required him to do so. In any event, no legal action was filed until March 1966, less than three years before he filed his California application; and within a month after the action was filed, Greene moved to Nevada, where he was not admitted to practice until a few weeks before filing his California application.

actively and substantially engaged in the practice of law in his father's Chicago law office until November 1968 constitutes a serious misrepresentation.

*Omissions on Greene's California Application of Certain*
*Litigation and an Arrest Warrant*

The application filed with respondent required Greene to disclose full information regarding any civil proceeding to which he had been a party. His answer stated that he obtained an annulment in 1966 in a specified action in Nevada and set forth the name and address of his attorney. Respondent found that Greene's answer did not mention (1) an action for separate maintenance brought in 1966 in Illinois against him by Anna Greene (a.k.a. Anna Schonblum), with whom he had participated in 1963 in a marriage ceremony that, if valid, resulted in their marriage, or (2) an action he brought in September 1968 in the United States District Court for the District of Nevada for declaratory relief as to the validity or invalidity of the annulment decree and an order concerning separate maintenance entered in the above mentioned Illinois action and for an injunction against Anna and damages for injuries allegedly caused by her; that Greene had been informed of the Illinois action apparently within a short time following its being filed; and that the Nevada federal court action was filed in Greene's physical presence, and he knew of its existence when he filed his California application. Respondent found: "Documents filed in the foregoing matters not set forth in the California application reflect badly upon [Greene] and detail incidents of embarrassment to [him]."

Another question on the application required disclosure of full information with regard to summonses, arrests, or charges of violation of any law. Greene's answer consisted of details of what he characterized as two "very minor traffic violations." Respondent found that in April 1968 a warrant for Greene's arrest was issued in New York on the basis of a nonsupport charge made by Anna, and that when he filed his California application, he was aware of that warrant. Respondent concluded that Greene, "believing it was to his advantage, failed to give the information called for described above, in knowing disregard of the truth."

Greene in his objections declared, as follows: "The alleged non-disclosed matters . . . were all discovered not through any independent investigation of the Committee, but because in an effort to cooperate fully, I voluntarily brought in a . . . box of personal files to Mr. McCloskey [respondent's secretary]. . . . I admitted negligence in not giving as much detail on my application as was called for—but *when alleged omissions were called to my attention,* I did the next best thing: In effect, I amended my

application by giving Mr. McCloskey 'full details' . . . and files on every aspect of my past." (Italics added.) Greene's statement shows that he did not provide the information until respondent had already discovered omissions on his application.

The omitted litigation and warrant concern the same woman involved in the litigation mentioned in Greene's application. This might suggest that the nondisclosures were unintentional, were it not for the fact that Greene testified that for many years he had spent about 20 hours a week working on the litigation filed by Anna against him, and its existence therefore could not possibly have slipped his mind. With respect to the litigation filed by Greene in the federal court a few weeks prior to his completing his California application, he admits that he researched the jurisdictional issue diligently and discussed it with the judge; and he obviously hoped it would be the solution to all his legal problems with Anna. Consequently, it is inconceivable that he could have forgotten about that litigation either.

When asked for an explanation regarding his omission of the Nevada federal court action, Greene first testified that the action was filed about the time he was filling out the California application and that "[i]n fact, I wasn't sure it was filed." On cross-examination, he testified, in part, that the action had been filed in his presence, and he was sure it was filed before the filling out of the application, but that he did not reveal the action because he did not know its number and was in a hurry to fill out the application because it was late. Thereafter, he testified that the reason he did not reveal the action was that he believed the Nevada court was going to dismiss it for lack of in personam jurisdiction over the defendant (Anna).

Greene testified that although he knew of the Illinois action that was omitted from his application, he had no obligation to give information regarding it, because it was his contention that the court lacked jurisdiction and that he was therefore not a party to the lawsuit. He also testified that he was not the person designated "William Greene" in that lawsuit. Thereafter, however, he testified that it would be a "fair conclusion" that the plaintiff intended to name him in the action. Furthermore, he admits that he arranged for one of his codefendants to propound interrogatories to him, and as a result of those interrogatories he filed a 47-page deposition in the action.[5] In the interrogatories, he was asked, "Are you the same WIL-

---

[5]Greene testified: "The problem was: How do we get my testimony in a Chicago action that I don't want to acknowledge exists. And between the two of us [he and a codefendant], he asked me certain interrogatories, I may have made some suggestions and changes, and I answered them and we filed it."

Greene was further asked: "Basically, you made these interrogatories a basis, a part

LIAM GREENE who is named as a defendant in the above-captioned cause?" His answer was, "Yes, I am that same WILLIAM GREENE."

Although Greene raises a question as to the court's jurisdiction over him for lack of personal service, it would appear that by filing his deposition and asking for relief he actually made a general appearance, thus giving the court jurisdiction over his person. (*Lacey* v. *Bertone,* 33 Cal.2d 649, 651 [1] [203 P.2d 755]; *Josephson* v. *Superior Court,* 219 Cal.App.2d 354, 361 [6] [33 Cal.Rptr. 196]; *Wilson* v. *Barry,* 102 Cal.App.2d 778, 781 [5] [228 P.2d 331].)[6]

Greene also testified with respect to his failure to list the omitted litigation: "And another way of looking at it is here you had a two-line space, and I kind of used up the space and ran over a line, and I felt that if Mr. McCloskey or anyone at the receiving end wanted to know about my

---

of your complaint of harassment by Anna Greene in Nevada, is that not right, to try to have the federal court exercise jurisdiction over Anne Greene?" He answered: "As I said, this was one of a long list of things, and as I answered the question at the beginning, this put me out of a few days of time and effort and money in answering these, and which, if Anna Schonblum hadn't existed, would have never existed."

[6]In his deposition, Greene inferentially asked that Anna's action be dismissed or that custody of the child be given to him. Thus, he stated, among other things: "Since the present action is for Separate Maintenance, it must be dismissed in any event because, after the filing of the pending complaint, I attempted to live with Plaintiff [Anna], and, until she thrust me out of my apartment in April 1966, I was sleeping under the same roof with Plaintiff.

" · · · · · · · ·

" . . . it is very possible that her diabolic acting skill would cause the Court to overlook the fact of an obviously void (and judicially nullified) marriage ceremony, and an equally obvious and well-documented spell of living together which would in any event make a dismissal of her separate maintenance suit mandatory.

" · · · · · · · ·

"Plaintiff and her conniving father turned me in for income tax offenses (for which I was cleared with a refund). They wrote my clients defamatory and false letters and burst into the offices of my business associates with wild threats and accusations (which utterly destroyed my credit and reputation). They claimed that I was a draft evader (when I was actually an honorably discharged veteran). Within the last month, they connived and conspired to destroy, out of pure meanness and vindictiveness, all my clothes and a valuable art collection which they had stolen last April. Worst of all, in spite of my repeated efforts to see my child, Zoe, Plaintiff has held her hostage, and cruelly abused her. Such people cannot be permitted to win lawsuits against innocent third parties. They should be burned at the stake. I realize that Plaintiff's actions are those of a deranged mental defective. Yet it is difficult to forgive when so much damage has been done.

" · · · · · · · ·

"Being quite expert in, and having studied child psychology, I feel that Zoe.would be well off with me. I expect to be admitted to the Nevada Bar shortly, and expect that ventures in ranching will provide a comfortable and healthy way of life to be shared with my daughter as she grows up. I would expect to send Zoe to the finest schools in the East when she reaches teen age, and to travel with her regularly to Europe and the Orient. I am sure I can provide a far better, more stimulating, and certainly more moral life than the filthy parasitic existence offered by Anna Schonblum, who is degenerate and mentally ill, and has for the past three years refused to work for a living."

personal and domestic affairs, all they had to do was to ask me and I would tell them." The application form provides only two lines of space for the applicant's answer to the question regarding civil litigation in which he had been a party, but it clearly directs, "Use an attached sheet if necessary."

With respect to his failure to reveal the warrant, Greene testified: ". . . this was a warrant for the arrest of Anna Schonblum's husband, William Greene. I'm not her husband, never was, never will be. [Greene, it will be recalled, had his marriage to her annulled in Nevada.] And so, how do I know it's the same person." He also testified that "it was almost by chance that this copy of this warrant was forwarded to me by a friend . . . in New York to whom it was mailed." On cross-examination, Greene stated that the warrant was mailed in an envelope addressed to him and sent to him in care of a friend in New York whom he had intended to visit at that time.

The documents filed by Greene in the omitted litigation actually do, in the language of respondent's findings, "reflect badly" upon him and detail incidents of embarrassment to him, compelling the conclusion that he intentionally withheld the information in an attempt to conceal the damaging material from respondent. We deem it unnecessary to burden this opinion with further details.

█ Under the circumstances, it would appear that Greene's conduct, as hereinabove detailed, was in knowing disregard of the truth and shows a lack of the requisite good moral character required of an attorney admitted to practice law in this state.

Greene's application for admission to practice in this state is denied.[7]

Petitioner's application for a rehearing was denied March 26, 1971.

---

[7]Under rule X, section 102, Rules Regulating Admission to Practice, this court's decision herein does not preclude Greene from making a new application upon the expiration of two years from the date respondent denied his application. Rule X, section 102, provides: "No new application, or petition for reconsideration of a previous application, from an applicant who has been denied recommendation by the committee on the ground of failure to prove good moral character, shall be considered by the committee within a period of two years next after the date of such denial unless, for good cause shown, permission to reapply or petition earlier than the expiration of two years is granted by the committee at the time of such denial. . . ."