**In re Appeal of Johnny Lee EVINGER, For Admission To the Oklahoma Bar Association By Examination.**

**S.C.B.D. No. 2624.**

Supreme Court of Oklahoma.

June 2, 1981.

Rehearing Denied June 2, 1981.

Annis Kernan, General Counsel, Bd. of Bar Examiners, Oklahoma City, for respondent Bd.

DOOLIN, Justice:

The petitioner (Evinger) and his dealings with the respondent (Board) have a long history dating to July 1978, when he was granted a temporary license to practice law.

### I—History

In the Fall of 1978 the Board, through powers granted it in Rule 11 of the Rules Governing Admission to Practice Law in the State of Oklahoma,[1] conducted an investigation into Evinger's qualifications to become a member of the State Bar. It determined that Evinger lacked the good moral character and due respect for the law mandated by Rule 1, and so recommended to this Court that his application for admission by examination be denied.[2] Evinger demanded a hearing to challenge the Board's recommendation, and the appellate process outlined in Rule 11 began in October of 1978.

The Board disqualified itself from said hearing, and this Court appointed a Special Board of Bar Examiners. That Special Board met for three days, during which Evinger was represented by counsel, and on March 7, 1979 issued its "Report and Recommendation" which recommended denial of Evinger's application to practice law. Evinger appealed to this Court. The appeal was interrupted for proceedings involving Evinger's application to proceed in forma pauperis;[3] action by the Board to dismiss the appeal for filing out-of-time (denied); argument over whether Evinger or Board

---

1. 5 O.S. Ch. 1, App. 5.

2. Evinger had passed the bar examination July 26–27, 1978.

3. Denied, see 604 P.2d 844 (Okl.1979).

should pay for the transcript (we determined the appellant had that duty).

The Board filed its "Statement of Action and Recommendation" on July 1, 1980 which was a summary of the evidence which led to the Board's recommendation, and we set briefing times for the parties. Evinger's second attorney withdrew as counsel on October 22nd, and his third attorney withdrew on February 24, 1981. Evinger's request for a third extension of time in which to brief was denied by this Court on February 9, 1981, and cause was ordered submitted on Board's Statement, with Evinger given until March 2, to reply. He did not reply.

## II—Facts

The Board called 15 witnesses, including two assistant district attorneys, three private attorneys and 10 laymen. Upon conclusion of all evidence it held Evinger lacked the good moral character and due respect for the law required for admission to the Bar under Rule 1.

Testimony is best summarized by events, rather than by personages:

(1) *Dog Incident*: Evinger's ex-wife testified he took her dog without her permission after they were divorced. When she paid him $200.00 for its return (the money was her idea), she said he demanded $300.00 more. This was observed and overheard by police surveillance, but Evinger denied the additional $300.00 request. Upon arrest growing from said incident, he assumed a "smirking" attitude toward the police and denied that he had received the $200.00 until they found the marked $200.00 hidden in his underpants. He was not remorseful or contrite, according to an assistant D. A. who witnessed the arrest and search. However, criminal charge of extortion was dismissed at preliminary hearing. A second charge involving the dog—knowingly concealing stolen property—was filed but dismissed on demurrer. At time of hearing the concealing charge a witness said Evinger asked her to keep the dog, and said Evinger "hoped" she wouldn't remember all the "facts" when she testified at the trial. The Assistant D. A. testified, and the preliminary hearing judge wrote, to the Board regarding Evinger's conduct. The prosecutor concluded, "I would question his moral character, and I do not think he has any respect whatsoever for our laws." Evinger said he had his ex-wife's consent to take the dog, but she denied such fact. In his application for registration as a law student, Evinger admitted the dog incident but said he was "set-up" by his former wife and an "overzealous" prosecutor. He claimed the prosecutor had a "personal grudge" against him, and said the prosecutor was later reprimanded by the D. A. for appearing in a custody hearing involving Evinger's son. The prosecutor said he was subpoenaed and attended the hearing with the approval of his superior and denied a "personal grudge."

(2) *Theft of a Coat*: Evinger's same ex-wife testified that after a trip to a department store during their marriage, Evinger came out with a coat for his son, even though she knew he had no money and could not use his credit card. He gave her the impression he had stolen it. At a 1978 hearing it developed there were three versions of why Evinger stole the coat, and a bar examiner asked him which one was the true story.[4] Evinger testified he didn't have the coat on, but may have, but did not recall saying the incident was a youthful indiscretion. On his Application for Registration for Bar Examination, Evinger failed to note he pled guilty to a charge of Petty Larceny concerning the coat, but wrote instead that the case was dismissed. He later testified he had in fact pled guilty to the misdemeanor and was given a six month deferred sentence.

(3) *Danner Van*: His former roommate testified Evinger took his van without his permission after they were no longer room-

4. The three versions are:
   (a) Youthful indiscretion and was sorry.
   (b) Had coat on and called roommate to bring money to buy it.
   (c) Had coat over arm and called roommate to see if he found his billfold.

mates, and that it was later recovered by police. He said he dismissed auto theft charges two hours after the arrest. Evinger said he had a key and borrowed his friend's van for moving purposes for he thought the friend was out of town.

(4) *Bankruptcy*: On his application Evinger said he was discharged in bankruptcy of about $3,000.00 in debts. He claimed this was mistake because he had made arrangements with all but one of his creditors and that he never knew about Chapter XIII program. But the attorney who handled the bankruptcy testified Evinger's liabilities exceeded $24,000.00 and that he fully advised him about the Chapter XIII proceedings. He further stated several lawsuits were pending against Evinger at the time, his salary was being garnished and that to his knowledge Evinger had made no arrangements with creditors to pay them.

(5) *Embezzlement*: Evinger's former roommate for whom he worked testified Evinger pocketed cash receipts belonging to the company and obtained cash when making bank deposits. The company's bookkeeper testified she reconstructed the records which indicated Evinger had pocketed cash receipts and had written unauthorized checks on the business account. Evinger said he was owed the money. Another former employer testified he discovered Evinger had pocketed cash receipts when his checks were returned marked insufficient funds. (Evinger denied the accusation). While Evinger was clerking for an attorney, a client testified Evinger gave her no part of an $80.00 child support payment he had collected from her former husband. Evinger admitted the charge. No formal charges were filed in any of the instances.

(6) *Promissory Notes*: The same former roommate testified Evinger coerced him to sign a $1,000.00 promissory note to prevent Evinger from selling his brother's car. In another incident a former employer testified Evinger coerced him to sign a $835.00 promissory note or he would make it rough for employer in his (the employer's) bankruptcy. Evinger denied coercion in both instances.

(7) *Attorney Fee*: Evinger clerked for an Oklahoma City Attorney. A child support client of the attorney testified she paid Evinger $75.00 in attorney's fee which the attorney testified did not show up on his books. The client said Evinger told her he did not want his benefactor to get the fee and asked her to call the attorney to discontinue the action. Evinger admitted receiving the money but said it was for his personal living expenses for the client's friend who was living in his house at the time. He did not explain the notation on the check, "attorney fees."

(8) *Car Purchase*: Evinger purchased a new 1978 Thunderbird and gave them a $1,000.00 check as down payment. The check was returned for insufficient funds. In return for the check Evinger gave the dealer his 1975 Cutlass which he said was in "working order" with only a dead battery. The dealer testified the car's motor had water in the oil and its transmission was broken. When Evinger fell behind in his car payments, the car was repossessed. Within one day thereafter Evinger admitted using his car keys and going upon the dealer's lot without permission, taking the car himself. He was later arrested but no charges were filed. Another Assistant D. A. testified Evinger showed no remorse at his repossession action. Evinger testified he knew the $1,000.00 check was bad but said the dealer had agreed to hold it for 30 days so he could raise the money. The dealer denied he was asked to hold the check. Evinger testified he had an agreement with the finance company to make one more payment and they would not repossess the car. He admitted an error in judgment in taking back his car but said he thought he was in the right in doing so; he said he thought the finance company did not make a "good repossession."

(9) *U. S. District Judge*: A trial judge for the Western District of Oklahoma recommended punitive action against Evinger and accused Evinger of misrepresenting facts. "His actions are severely criticized and never condoned," he deposed. "You deliberately misrepresented facts to me.

Mr. Evinger has not testified to the truth in this case."

(10) *Other Evidence* : An attorney who represented Evinger's former roommate in a suit for back wages filed by Evinger (the suit ended with Evinger having to pay his roommate's attorney $300.00 in attorney fees for all of his allegations were found baseless) said Evinger's suit was a "sham, a misuse of the legal process." He testified Evinger "uses the law as a tool to his own use. A client or the legal profession as a whole would be in jeopardy if he got in there. He lies to suit his purpose."

Another attorney, who represented Evinger in his bankruptcy, described Evinger as "a manipulator." "I did not have a lot of respect for him. I do not think that claim (Evinger v. his roommate) was brought in good faith. It was groundless."

A Tulsa attorney hired by the Board to investigate accusations against Evinger and who took depositions from Evinger, testified as follows:

"He was incapable or was not telling the truth to me when he was interrogated concerning past transactions. I felt if licensed, if he would come to the Board of Bar Examiners and their representatives and lie repeatedly, would do the same thing with the judges and other people in litigation."

To establish his good moral character, Evinger called several character witnesses. However the Board argues much of their testimony should be discounted because the witnesses knew little of Evinger's background. For example, two witnesses testified they had never met Evinger but had only talked to him over the telephone. A former employer said Evinger was a good worker but had worked for him only a few months, and he knew nothing of his past indiscretions. A judge testified he knew Evinger only on a professional basis and then only for a brief period when Evinger presented one case to his court. A minister said he had known Evinger only for a few months and knew nothing of his personal life or past indiscretions. A woman who said she dated Evinger for several years admitted she knew little of his personal

background and his past encounters with the law. Several of Evinger's witnesses could express no opinion about his moral character or respect of the law.

The Special Board concluded that the petitioner's application for admission to the bar be denied for failure to demonstrate good moral character and due respect for the law.

I

The burden of proving good moral character and due respect for the law is upon the applicant, who must initially furnish sufficient evidence of good moral character and due respect for the law to establish a prima facie case. The Board then has an opportunity to rebut such showing with evidence of bad moral character and lack of respect for the law. *Greene v. Committee of Bar Examiners*, 4 Cal.3d 189, 93 Cal.Rptr. 24, 480 P.2d 976 (1971). At least one court has concluded that any reasonable doubt must be resolved in the petitioner's (person attempting to be admitted to the State Bar) favor. *Greene v. Committee of Bar Examiners, supra.*

In *Greene* the California Supreme Court denied admission to an applicant who intentionally withheld information in an attempt to conceal its damaging nature from the Bar Examiners. That court also made the conclusion that unintentional nondisclosure of relatively unimportant matters in an admission application does not justify exclusion from the Bar.

The Board of Bar Examiners' investigation need not be confined to acts which have occurred since the petitioner first made application to take the bar examination but it may consider any act or course of conduct occurring at any time, prior to the admission, provided they have a legal tendency to prove the applicant's present character. *Petition of Bowen*, 84 Nev. 681, 447 P.2d 658 (1968).

The first qualification for license as attorney at law is that such person be of good moral character, and particularly as

respects the responsibilities and duties of an attorney. This requirement of good moral character is a continuing qualification. *State ex rel. Oklahoma Bar Association v. Booth*, 441 P.2d 405 (Okl.1966).

We do not take that qualification, or our responsibility to pass upon an applicant's moral character, lightly. It is a duty we owe to ourselves, the bar and the public to see that a power which may be wielded for good or for evil is not entrusted to incompetent or dishonest hands. *State ex rel. Oklahoma Bar Association v. Trower*, 381 P.2d 142 (Okl.1963).

■ The evidence shows a pattern beginning in 1972 and continuing through 1978 when the hearing was held before the Special Board, a pattern we cannot disregard. Lastly we note the Federal judge's reprimand of Evinger occurred the day before the Special Board's hearing.

In light of the weight of the evidence presented and also taking into consideration the paucity of evidence offered by Evinger, we conclude that Evinger has failed to meet his burden of proving his good moral character and due respect for the law.

The conclusion of the Special Board of Bar Examiners is affirmed and the petitioner is denied admission to the Oklahoma Bar.

IRWIN, C. J., BARNES, V. C. J., and WILLIAMS, HODGES, LAVENDER, SIMMS and HARGRAVE, JJ., concur.