[L. A. No. 29314. In Bank. Aug. 8, 1968.]

HAYES ALAN BERNSTEIN, Petitioner, v. COMMITTEE OF BAR EXAMINERS, THE STATE BAR OF CALIFORNIA, Respondent.

William P. Camusi for Petitioner.

Kenneth D. McCloskey and Crawford J. Cofer for Respondent.

THE COURT.—Hayes Alan Bernstein seeks review of the action of the Committee of Bar Examiners in refusing to certify him to this court for admission to practice law in California. (Bus. & Prof. Code, § 6066.)

Bernstein, now aged 43, in 1963 received an LL.B. from Southwestern University in Los Angeles. After failing a 1963 bar examination, he passed one in the spring of 1964. Thereafter Bernstein's application for admission was referred to a subcommittee of respondent for a hearing and report regarding his moral character. Following nine hearings, the subcommittee determined that Bernstein is of good moral character and recommended that he be certified for admission to practice.[1] Respondent, after reviewing the report and recommendation of the subcommittee and receiving additional evidence in the form of testimony by Bernstein, adopted a resolution refusing to certify him for admission to practice. A petition for reconsideration was granted, and thereafter respondent again adopted a resolution refusing to certify Bernstein for admission to practice.[2] The refusal was on the ground that "the record as a whole demonstrates a lack of truthfulness and candor on the part of [Bernstein] and he has not shown himself to be possessed of good moral character. . . ."[3] After issuing a writ of review, we granted a mo-

---

[1] Two members of the subcommittee made the recommendation; the third member had resigned from the subcommittee for personal reasons.

[2] The vote was 5 to 1.

[3] Bernstein argues that the Rules Regulating Admission to Practice "do not seem to permit a reversal of the Subcommittee's findings and recommendations favorable to the Applicant." However, it is apparent from the language of the rules that respondent is not bound by the report and recommendation of its subcommittee. Section 101.1 of rule X provides in part: "The committee may act upon the subcommittee's report, take additional evidence or set aside the report and hear the whole matter de novo." Additional provisions in the rules, such as a provision that, if the subcommittee's report is unfavorable, the applicant has the right to file an application for the presentation of additional evidence or for a hearing de novo (see rule X, § 101.8), clearly do not prevent respondent from on its own motion taking additional evidence or hearing the matter de novo where the subcommittee's report is favorable to the applicant.

tion by respondent to augment the record and referred the matter to respondent for further proceedings and a report of the circumstances surrounding Bernstein's signing his former wife's name to a check, an act of which respondent and its subcommittee had been unaware. After a further hearing, a supplemental report was filed in which respondent again concluded that Bernstein has not shown himself to be of good moral character.[4]

    █ "Under Business and Professions Code section 6060 in order to qualify for certification an applicant must, among other things, 'Be of good moral character.' (Bus. & Prof. Code, § 6060, subd. (c).) █ Under the Rules Regulating Admission to Practice Law the burden of proving good moral character is upon the applicant. (Rule X, § 101; see also *In re Garland,* 219 Cal. 661, 662 [28 P.2d 354]; *Spears* v. *State Bar,* 211 Cal. 183, 188 [294 P. 697, 72 A.L.R. 923].) Pursuant to this rule the applicant must initially furnish enough evidence of good moral character to establish a prima facie case, and the committee then has the opportunity to rebut that showing with evidence of bad character. (*Konigsberg* v. *State Bar of California,* 366 U.S. 36, 41 [6 L.Ed.2d 105, 111, 81 S.Ct. 997].)" (*Hallinan* v. *Committee of Bar Examiners,* 65 Cal.2d 447, 449, fn. 1 [55 Cal.Rptr. 228, 421 P.2d 76].)

    █ At the hearings the following evidence of Bernstein's good moral character was introduced:

A prominent former state official wrote a letter of recommendation on Bernstein's behalf, stating in part, "I have known Mr. Bernstein for approximately fifteen years. He has been an extensive property holder in this area, and has been active in civic and church affairs. He is a respected member of his community. I recommend that he be accepted by your bar association."

A superior court judge stated, "I have known Mr. Bernstein for at least one year, but only socially, and I can say that in my opinion he appears to be a person of good character. However, my observation is limited purely to that of a social acquaintance." An attorney, who was a friend of Bernstein, wrote that he highly recommended Bernstein for admission to practice.

The president of the Beth Jikvah Congregation wrote that Bernstein has been active in community affairs for 15 years and "has given generously of his time and money for both

---

[4]There were no dissenting votes.

religious and philanthropic projects.'' A letter from a bank vice president stated that Bernstein has been favorably known to the bank for 12 to 15 years, has conducted various business operations in a satisfactory and honorable manner, and has maintained a good reputation in the community.[5]

Bernstein testified: He was never ''in any difficulty as a . . . child of any major importance.'' During the second world war he served more than a year overseas before receiving a discharge under honorable conditions. He thereafter obtained a B.A. degree and while attending college was gainfully employed. He subsequently engaged in various business enterprises in California before starting law school in 1959.

The foregoing evidence establishes a prima facie case of Bernstein's good moral character. Respondent, however, points to the following matters to rebut that showing:

### 1. *Forgery of former wife's name to check*

Respondent's findings on this subject may be summarized as follows:

In a divorce action against Bernstein the court decreed in March 1966 that an anticipated tax refund was the property of Bernstein and his former wife as tenants in common. In April 1966 a final divorce decree was entered. Bernstein subsequently received a $1,906.79 check payable to him and his former wife, in payment of the tax refund. In May 1966, without her authorization and with the intent to defraud her, he signed her name, as well as his own, on the check and negotiated it to a bank, receiving therefor $1,300 cash and a $606.79 credit in his bank account.

Thereafter on several occasions she inquired whether he had received the refund, and he concealed from her the fact that he had received it and made statements that were intended to and did lead her to believe he had not received it.

Respondent further determined that there was no evidence of circumstances which excused him or mitigated the misconduct.

Bernstein asserts that the evidence does not show that his intent was to defraud his former wife but instead shows that he ''was intent on merely harassing and otherwise . . . con-

---

[5]Bernstein appears to complain that respondent failed to introduce some additional favorable letters of recommendation in its possession. Respondent states that it has three ''Confidential Questionnaires,'' which were solicited upon the understanding that the source of the information contained therein would not be made known to the applicant. Respondent obviously was under no duty to introduce such material.

founding'' her. He also objects to the determination that there was no proof of circumstances which excused him or mitigated the misconduct.

██ ██ Respondent's findings are not binding upon this court but are entitled to great weight, and the burden of showing that the findings are not supported by the evidence or that respondent's action is erroneous is upon the petitioner. This court examines and weighs the evidence and passes upon its sufficiency, and any reasonable doubts are resolved in favor of the petitioner. (*Hallinan* v. *Committee of Bar Examiners, supra,* 65 Cal.2d 447, 450-453; cf. *Most* v. *State Bar,* 67 Cal.2d 589, 596 [63 Cal.Rptr. 265, 432 P.2d 953].)

██ Judged by these standards the finding that Bernstein intended to defraud his former wife is clearly supported by the weight of the evidence. At the hearing he admitted that he signed her name on the check and knew that he did not have her authorization to do so, and it is undisputed that he thereafter negotiated the check. ██ The signing of a person's name without authority, at least where the instrument has been uttered, is sufficient to imply an intend to defraud. (*People* v. *Weitz,* 42 Cal.2d 338, 350 [267 P.2d 295].) ██ That intent is also shown by evidence that for over a year he concealed from his former wife the receipt of the check and during that period made statements which were intended to and did mislead her.

Bernstein points to evidence that when he signed her name on the check he had a $30,911 promissory note from her that was payable in 1975 or earlier upon the occurrence of a specified event. However, such evidence manifestly does not show that when he signed her name he did not intend to defraud her.

██ Bernstein asserts that he lacked emotional stability during the period in question. He testified: After seeing ''considerable action in the Pacific'' he was ''confined . . . for mental reasons'' and received treatment for several months. Following his discharge from the service he had no problems until he started law school, at which time his former wife and her mother ridiculed him for giving up business to study law. He became depressed when he failed his first bar examination and subsequently felt anger and anguish over the instant proceedings. He had periods of depression and ''actu-

al withdrawal,'' was ''confined'' for one period[6] and saw a psychiatrist for about three years. It was explained to him that he had strong emotional reactions when his former wife remarried and became pregnant. He felt he had resolved his mental problems ''some time ago'' and realized his signing the check was ''foolish'' and ''stupid.''

In corroboration of Bernstein's testimony concerning his mental stability, his attorney testified that his experience with Bernstein began at the divorce proceedings; that during those proceedings Bernstein sometimes refused to sign documents which were for his own benefit; that Bernstein was then a mentally disturbed person; that he ''had something happen to him . . . near the end of the war, when he was literally blown out of the water''; and that in the attorney's opinion Bernstein's mental problem was a temporary one and he would not act in the same manner in the future.

The foregoing evidence relating to Bernstein's psychological problems does not show that he was incapable of having an intent to defraud nor does it warrant our finding, contrary to respondent, that he in fact did not have such an intent.

The evidence of his psychological problems likewise does not excuse or mitigate his misconduct. In *Grove* v. *State Bar,* 66 Cal.2d 680, 685 [58 Cal.Rptr. 564, 424 P.2d 164], in which we disbarred an attorney for misconduct involving an habitual disregard of his clients' interests, the petitioner presented an affidavit by a psychiatrist from which it appeared in part that the petitioner needed psychiatric care and that his condition impaired his capacity to form sound judgments, and we stated that ''We realize that in many cases psychoneurotic problems may underlie . . . moral turpitude. In this area our duty lies in the assurance that the public will be protected in the performance of the high duties of the attorney rather than in an analysis of the reasons for his delinquency. Our primary concern must be the fulfillment of proper professional standards, whatever the unfortunate cause, emotional or otherwise, for the attorney's failure to do so.''

█ Bernstein states that he has made restitution to his former wife. However, a petitioner ''is not entitled to any indulgence by reason of restitution of moneys wrongfully retained, especially where such restitution is made merely as a matter of expediency and under pressure.'' (*Resner* v. *State Bar,* 53 Cal.2d 605, 614 [2 Cal.Rptr. 461, 349 P.2d 67]; see

---

[6] According to Bernstein's brief, he was confined in 1964 for a short time when he had a breakdown following his father's death.

also *Pearlin* v. *State Bar*, 18 Cal.2d 682, 684 [117 P.2d 341] ; *Maggart* v. *State Bar*, 7 Cal.2d 495, 502 [61 P.2d 451].)

2. *Bernstein's false or misleading statements in a verified answer.*

The executor of the estate of Bernstein's sister brought a suit against Bernstein to recover the amount of certain storage charges paid by the estate, and in a verified answer signed in 1962 Bernstein stated in part, as a defense, that in 1960 probate proceedings involving the estate the judge "stated . . . 'he was of the opinion that [Bernstein] acted as a reasonable man, and he took necessary steps for the preservation of the estate.' [The judge in the probate proceedings] ordered [Bernstein] to hand over to [the executor] the items [apparently referring to ones necessary to get the property out of storage], and ordered [the executor] to accept them, with any incurred expenses to be borne by the estate."[7] From the transcript of the probate proceedings it appears that the judge made no order as to who would pay for the storage charges and that instead the parties stipulated that if the executor paid those charges such action would be without prejudice to any claim he might have against Bernstein for the charges. Also it does not appear from that transcript that the judge stated that Bernstein "acted as a reasonable man" and "took necessary steps for the preservation of the estate" but rather the transcript shows that the judge stated that he could see how there would be a controversy and Bernstein might be in a position to say, "All right, I did this to preserve the property."

At a subcommittee hearing in 1965 after the State Bar examiner read to Bernstein the quoted statement in his answer and the stipulation made at the probate proceedings Bernstein testified, "That's exactly what I said, that he did not want to accept the tender . . . and the Judge told him to accept it and that he should pay it or the Estate should pay it." The examiner stated, "But, Mr. Bernstein, . . . it was stipulated that it was without prejudice to [the executor's] action against you for the storage charges; isn't that right?" and Bernstein replied, "That's right. . . ." At the 1966 hearing before respondent when asked if he thought the statement in his answer was a fair characterization of the judge's ruling and statement, Bernstein replied, "That is exactly

---

[7]Bernstein's defense was unsuccessful, and judgment was rendered in favor of the executor.

what the judge said . . . and [the judge] said that it wasn't up to him to determine if I should be charged . . . and [the judge] said that he didn't feel that it wasn't before him to rule who should pay. He said he ordered [the executor] to pay for it, . . .''

■ The making of a knowingly false or misleading statement in a pleading with an intent to deceive is, of course, highly improper. (*Vickers* v. *State Bar,* 32 Cal.2d 247, 252-253 [196 P.2d 10]; *Pickering* v. *State Bar,* 24 Cal.2d 141, 144-145 [148 P.2d 1]; *Paine* v. *State Bar,* 14 Cal.2d 150, 151-153 [93 P.2d 103]; *Bruns* v. *State Bar,* 213 Cal. 151, 152 et seq. [1 P.2d 989].) Bernstein was present at the probate proceedings, and it was only about two years later when he prepared the answer. He has made no claim that he was then honestly mistaken as to what occurred at the probate proceedings, and it would appear that he must have known that his answer contained false or misleading statements. The presentation to a court of a statement of fact known to be false presumes an intent to secure a determination based on it. (*Vickers* v. *State Bar, supra,* 32 Cal.2d 247, 253.)

Bernstein's testimony on the matter at the hearing before respondent also appears to lack candor and truthfulness. Discussion of the matter at that time could not well have been a surprise to him since he previously had been questioned regarding it at the subcommittee hearings.

3. *Fraudulent representations by Bernstein in the land transaction.*

■ In a civil action for fraud, which was brought against Bernstein by Arthur Sherman, Herbert Cooper, and Edward Thayer, the court found in part as follows:

In 1960 Bernstein falsely and fraudulently represented to the plaintiffs that he and a Dr. Hoffman, had invested $32,000 in certain land whereas in fact they had invested only $18,500, and in reliance upon the representation the plaintiffs agreed to pay $16,000 for Dr. Hoffman's interest. Bernstein falsely and fraudulently represented that he had purchased Dr. Hoffman's interest on behalf of the plaintiffs for $16,000 and would convey the money to Dr. Hoffman if the plaintiffs would deliver the same to him and in reliance upon the representation the plaintiffs paid Bernstein $16,000. Bernstein paid Dr. Hoffman only $11,000 and retained $5,000 as a secret profit. The plaintiffs were damaged $5,000 by Bernstein's false and fraudulent conduct.

In the instant proceeding testimony of Sherman and Bern-

stein concerning the land transaction is in direct conflict as to many of its principal features, and the testimony of neither witness is in complete accord with the findings in the civil action.

In brief, Sherman testified as follows: In 1960 Bernstein falsely represented that he and Dr. Hoffman paid $30,000 for the land and that Dr. Hoffman wanted to sell his interest for $15,000. [The price paid by Bernstein and Dr. Hoffman for the land was in fact between $18,000 and $22,000.] Sherman, on behalf of himself, Cooper, and Thayer, delivered to Bernstein a $1,000 check toward the purchase price. Bernstein later stated that Dr. Hoffman had changed his mind about selling. Sherman requested the return of his check, and Bernstein replied that he had lost it. Thereafter Bernstein stated that Dr. Hoffman had again decided to sell his interest, and Sherman delivered to Bernstein a $15,000 check for the purchase of that interest, and Bernstein stated he would take it to Dr. Hoffman and make the purchase. Sherman subsequently discovered that both the $1,000 check and the $15,000 check were cashed and that Dr. Hoffman received only $11,000 from Bernstein.

On the other hand, Bernstein testified in brief as follows: He agreed to sell to Sherman for $16,000 an interest in the land that Bernstein had previously orally agreed to buy from Dr. Hoffman for $11,000. He did not recall any discussion with Sherman as to what Dr. Hoffman and Bernstein had paid for the land. He received from Sherman both the $1,000 and the $15,000 checks, and he did not tell Sherman that the $1,000 check was lost. When he paid Dr. Hoffman $11,000 for his interest, he stated he was going to resell it for $15,000 or $16,000 and Dr. Hoffman replied, ''Good luck.''

Dr. Hoffman, however, testified that such a conversation did not occur and that when he sold his interest to Bernstein he had no reason to believe Bernstein had a buyer for that interest.

The subcommittee found that the evidence was ''inconclusive'' and that ''no offense involving moral turpitude or actual fraud was proved.''

The findings in the civil action are not binding upon this court (cf. *Lefner* v. *State Bar*, 64 Cal.2d 189, 192 [49 Cal. Rptr. 296, 410 P.2d 832]), nor are the subcommittee's findings binding upon us (cf. *Schullman* v. *State Bar*, 59 Cal.2d 590, 599 [30 Cal.Rptr. 834, 381 P.2d 658]). When a subcommittee's findings rest primarily upon testimonial evidence, we

are reluctant to reverse its decision because it was in a better position than we are to evaluate conflicting statements after observing the demeanor of the witnesses and the character of their testimony. (*Zitny* v. *State Bar*, 64 Cal.2d 787, 790 [51 Cal.Rptr. 825, 415 P.2d 521].) Here, however, a trial court also heard evidence relating to the land transaction and found that there was fraud.

Substantial evidence supports the trial court's findings that Bernstein made false and fraudulent representations to Sherman as to the price Bernstein and Dr. Hoffman paid for the land and as to what would be done with funds delivered by Sherman to Bernstein. Discrepancies between the findings and Sherman's testimony, such as the finding that Bernstein falsely represented the original purchase price as $32,000 whereas Sherman testified Bernstein falsely represented it as $30,000, appear to be immaterial here. Although Bernstein's testimony conflicted with that of Sherman, the trial court, hearing the case in 1962, was in a better position than the subcommittee or this court to determine the factual issues. In our opinion fraud is shown, and Bernstein's testimony on the matter in the instant proceeding lacked candor and truthfulness.

4. *Bernstein's false testimony regarding gold transaction.*

In a civil action against Bernstein for an accounting, tried in 1962 together with the action for fraud, the trial court found in part that in 1960 the plaintiffs (Sherman, Cooper and Thayer) and Bernstein entered into a joint venture for the purchase of gold and that it was untrue that Bernstein acquired gold on his own account and subsequently sold a portion of it to the plaintiffs at $36.50 an ounce. In that action the parties stipulated that if they entered a joint venture for the purchase of gold the plaintiffs would be entitled to recover $2,340, and judgment was rendered for this amount against Bernstein.

In the instant proceeding the testimony of Sherman and Bernstein regarding their oral agreement for the purchase of gold is in sharp conflict.

In brief, Sherman testified as follows: In 1960 he and Bernstein orally agreed that they, Cooper and Thayer would buy $100,000 of gold on the London market. Bernstein stated that they would need $8,120 to buy the gold on a 95 percent margin; that the $8,120 included a $5,000 down payment, $2,612.50 prepaid interest, plus other itemized expenses. Bernstein represented that if Sherman, Cooper and Thayer would

contribute $2,030 (¼ of $8,120) he would do likewise. They each gave Bernstein a check for $2,030. Bernstein made the $5,000 down payment on the gold, pocketed the remaining $1,090 proceeds of the checks, and invested no money of his own. Their gold was resold at a loss, and Bernstein kept one-fourth of the 700-odd-dollar net proceeds of the resale.

The records of Morton Seidel and Company, the brokerage firm which handled the transaction, show that only one $5,000 payment was made by Bernstein on the gold, that the interest was not prepaid but was deducted from the gross proceeds on the resale, and that the gold was resold at a loss of $2,243.92.

Bernstein's version of the transaction was as follows: He agreed to sell to Sherman, Cooper and Thayer at $36.50[8] an ounce three-fourths of $100,000 of gold he had recently purchased from Morton Seidel and Company at $35⅞ an ounce. They did not reduce to a dollar amount the profit to which he was entitled. Sherman's testimony as to how they computed the $2,030 was correct. However, Bernstein did not represent to Sherman that "I was going to invest my one-fourth." The purchase was made on Bernstein's credit, and "Either I contributed [my one-fourth] or my credit was there." After they sold the gold they had difficulty computing the amount each should receive of the 700-odd-dollar net proceeds, and Cooper stated "we are talking about a few hundred dollars one way or another" and suggested they split those proceeds four ways. Bernstein thereupon gave the others a check for three-fourths of the proceeds.

The trial court rejected Bernstein's version of the transaction and found in accord with that of Sherman. On the other hand, the subcommittee made a lengthy inquiry into the matter before determining that the evidence before it was inconclusive and that no offense involving moral turpitude was proved.

In our opinion, however, the trial court, hearing the case when it did, was in a better position than the subcommittee or this court to determine the factual issue as to the contents of

[8]According to Bernstein, the $36.50 price was arrived at as follows: He called Arnold Seidel, a broker, on a speaker phone and after introducing Sherman inquired as to the price of gold and Arnold replied something like $36.38. Thereafter Sherman said to Bernstein, "Okay give me the three-quarters," and they agreed to "round [the sum] off [at] $36.50 for easy figuring."

Arnold Seidel testified that about one to four days after Bernstein purchased the gold Bernstein introduced him to "other people" on a speaker phone; that he does not recall their names; and that he was asked the price of gold but does not recall what figure he quoted.

the oral agreement. Furthermore, the method of computation of the amounts paid by Sherman, Cooper and Thayer to Bernstein and of the division of the proceeds on resale appears more consistent with Sherman's version than with Bernstein's.

It also seems unlikely that Bernstein was honestly mistaken as to the contents of the oral agreement, and we believe that respondent is correct in asserting that Bernstein's testimony regarding the gold transaction tends to show he lacks candor and truthfulness.

5. *Bernstein's false testimony at a California Horse Racing Board Hearing.*

In 1963 a hearing was held before the California Horse Racing Board to determine whether Bernstein had an undisclosed partner in ownership of several race horses. At that hearing in response to questions Bernstein testified that he had been arrested for battery and traffic violations. He was then asked, ''Aside from that have you had any other arrests or convictions?'' and he replied, ''That is as far as I know.'' He was later asked, ''Weren't you convicted of contracting without a license?'' and he answered, ''Subsequently overruled.'' He was thereafter questioned at some length as to whether the conviction was reversed on appeal and he repeatedly stated that it was ''reversed'' and ''overruled.''[9] In fact no appeal was taken from the judgment of conviction.

When asked by respondent why he did not disclose the conviction immediately at the 1963 hearing, Bernstein replied that he did not know, that '' [m]aybe sometimes unpleasant things have a way of your forgetting about [them],'' that he

---

[9] ''Mr. KLEIN: You say it [conviction of contracting without a license] was reversed on appeal?
''A Yes, that the item was not considered a realty. It was a portable type structure and did not come under it.
''Mr. KLEIN: We are not interested in det..ils for the moment. . . . Were you convicted and sentenced to three years probation?
''A There was a finding on this, yes; subsequently overruled.
''Mr. KLEIN: That went up on appeal?
''A It was reversed, yes.
''Mr. KLEIN: You are an attorney. You know what appeal means and reversed.
''A This was——
''Mr. KLEIN: And convictions aren't overruled, you know that.
''A Yes, it was overruled.
''Mr. KLEIN: Overruled?
''A The interpretation that they had based this upon was a ruling that this became a part of the permanent structure and part of the realty. It was later ascertained it was a movable, portable item prefabricated, and did not come under the jurisdiction of the building.
''Mr. KLEIN: This subsequent overruling, was that in your case?

was under pressure, and that it "didn't dawn on me that [the examiner] was talking about something that had happened five or six years before." Bernstein thereafter admitted, however, that the battery conviction was fifteen years before the hearing. He further testified that he had listed the conviction of contracting without a license on an application that the Horse Racing Board had in front of them. In a 1959 application for an owner's license filed with the Horse Racing Board, Bernstein included under prior offenses of which he had been convicted "1959—B & P Code—sec. 7028 Pending."

At a subcommittee hearing Bernstein testified that he was in error when he used the word "appealed" in his testimony before the Horse Racing Board, that he used the word "during the heat of the argument," and that there were merely

---

"A Yes.
"MR. KLEIN: You won your appeal, is that what you are telling us?
"A Yes, that is what I am telling you.
"MR. KLEIN: And was that a reported case, do you know? Was that in the Appellate Department of the Superior Court?
"A I don't recall.
"MR. KLEIN: Your conviction in that case was reversed?
"A Yes, it was.
". . . . . . . . .
"MR. KLEIN: . . . I have here a . . . copy of a record of conviction of yourself . . . showing that . . . you were charged with . . . violating Section 7028 of the Business and Professions Code [engaging in business or acting in capacity of contractor without license], and in February of 1959 you pled guilty. . . . Now, are you telling us, and I also show you additional pages on here dealing with probation, and so forth through August of 1960, are you saying sometime subsequent to this you appealed this conviction and the conviction was reversed?
"A BY THE WITNESS: Yes, there was the laboratory tests that were made on the basis——
"MR. KLEIN: Don't tell me details or why. Your testimony is that you or your counsel sometime subsequent to August of 1960 took this case on appeal and it was reversed?
"A Yes. In other words, the information that was on there, it was decided that this was not under the Building Department authorization, and this is what it was predicated on. I was in the manufacturing——
"MR. KLEIN: When did you file your appeal? Your conviction was in February of '59, and this record which goes all the way to August, '60 where you were cited for revocation of probation has no indication of that at all.
"A Where is that? Well, this is when it took place. Sometime later the Building Department required before they would approve these structures that they have laboratory tests made on the load weight, the live and dead load. This was all done. It was taken before the Building Commission, and the rulings were made on it subsequent to this, and also the fact that these couldn't be considered part of real property.
"MR. KLEIN: And the count to which you pled guilty was set aside?
"A Well, yes, this was the basis of the thing. In other words, they had this as a violation of a contracting license, because they felt that this was under the Building Code."

"administrative proceedings that bore some light on the ques-. tion of fact which was involved" in the criminal action. He gave similar testimony at the hearing before respondent.

The subcommittee found that Bernstein made untrue replies in his testimony before the Horse Racing Board but that he did not do so willfully.

Although proof that less than five years before the 1963 hearing Bernstein served several days in jail as a result of his conviction of contracting without a license is an indication that he would not have forgotten that conviction and that therefore his initial failure to disclose it was willful, his apparent lack of motive for such failure and the fact that he listed the conviction on his application tend to show that the failure was unintentional. Since reasonable doubts must be resolved in Bernstein's favor (*Hallinan* v. *Committee of Bar Examiners, supra,* 65 Cal.2d 447), we conclude that his failure initially to disclose the conviction was not willful. However, once the conviction was brought to his attention he recalled it and must have known that he did not appeal from it and that his conviction was not reversed. Since he had graduated from law school several months before the 1963 hearing, he must have known that administrative proceedings would not reverse a judgment of conviction. Although there is no direct evidence of his motive for misleading the Board regarding an appeal, he may have been seeking to exculpate himself from previously having falsely stated that he had no arrests or convictions apart from battery and traffic violations.

6. *Miscellaneous Matters*

Respondent filed a second supplemental report concerning certain recent matters, which occurred after the subcommittee hearings. That report and its supporting record show:

In December 1967 and January 1968 and for an unknown period prior thereto Bernstein maintained outside the entrance door to his apartment a card that identified him as an attorney. The card was visible only to someone who entered the apartment house and went upstairs to Bernstein's apartment. Since the instant petition was pending at the time in question, Bernstein manifestly was aware he had not been admitted to practice.

Respondent further found: In December 1967 Bernstein, answering an advertisement for the sale of a used Ansafone machine, valued at about $300, obtained possession of it for a short trial period and thereafter, despite repeated efforts of the owner to obtain its return and to communicate with Bernstein, Bernstein made no effort to communicate with him

until late April 1968 and retained possession of and used the machine until mid-May 1968. *In all disputed matters Bernstein's testimony was unworthy of belief.*

Bernstein objects to the italicized finding. He asserts that his testimony was worthy of belief and that there was not "too much" inconsistency between his testimony and that of the others. However, respondent was in a better position than we are to evaluate conflicting statements after observing the demeanor of the witnesses and the character of their testimony. (Cf. *Zitny* v. *State Bar, supra,* 64 Cal.2d 787, 790.) There are substantial conflicts between the testimony of Bernstein and that of other witnesses relating to the transaction, and in our opinion the record warrants the finding.

*Conclusion*

In view of the matters previously set forth we have concluded that Bernstein has not met his burden of showing that respondent's decision is erroneous.[10] In our opinion the record supports respondent's determination that the record as a whole demonstrates a lack of truthfulness and candor on the part of Bernstein and that he has not shown himself to be of good moral character. Certain of the matters, if considered alone, are not of sufficient consequence to rebut his showing of good moral character, but the record in toto, or a single matter such as the 1966 forgery and accompanying deceit, clearly rebuts that showing.

Although Bernstein asserts that his "problems" stemmed from psychological difficulties and testified that he has received psychiatric care and feels he resolved his mental problems "some time ago" and his attorney similarly testified that he believed Bernstein's mental problem was temporary and recommended his admission, this evidence is insufficient to show that Bernstein is now rehabilitated and of good moral character. We think that the burden properly rests on him to prove by sustained conduct over a period of time that he is in fact rehabilitated and of good moral character. In the future he may file with respondent a new application or petition for reconsideration as specified in rule X, section 102, of the Rules Regulating Admission to Practice.

The action of respondent is affirmed, and the petition is discharged.

Petitioner's application for a rehearing was denied September 5, 1968.

---

[10]This conclusion renders it unnecessary to consider several additional matters pointed to by respondent in support of its action.