[L.A. No. 31071. Nov. 27, 1979.]

WILLIS BURDETTE HALL, Petitioner, v.
COMMITTEE OF BAR EXAMINERS
OF THE STATE BAR OF CALIFORNIA, Respondent.

COUNSEL

Goldin & Goldin and Martha Goldin for Petitioner.

Herbert M. Rosenthal and Margaret G. Wilkinson for Respondent.

OPINION

**TOBRINER, J.**—Willis Burdette Hall seeks review of the action of the Committee of Bar Examiners of the State Bar (Committee) denying him certification to this court for admission to the bar on the ground that he lacks the "good moral character" required for such admission. (Bus. & Prof. Code, § 6060, subd. (c); Rules Regulating Admission to Practice Law, rule X, § 101(a).)[1]

In reaching its decision to exclude Hall from the practice of law, the Committee relied heavily on its premise that Hall had failed to demonstrate adequate "remorse" for conduct in which he had engaged in managing an employment agency between 1972 and 1974 and for which he had been disciplined through a 20-day suspension of his employment agency license by the state Bureau of Employment Agencies (Bureau). Hall contends that the record in his case belies the Committee's conclusion that his so-called "lack of remorse" reflects an absence of respect for the judicial process or an unwillingness to conform his conduct to professional standards of ethics. Hall maintains, to the contrary, that his attitude throughout the Committee's proceedings simply reflects his honest and sincere disagreement with the prior administrative findings, a position that does not constitute a basis for the Committee's finding that he lacks "good moral character" or is likely to behave in an unethical manner if admitted to the bar. As we shall explain, under the circumstances of this case we believe that Hall's contentions are well taken and that the present record does not support the Committee's decision to deny Hall the opportunity to practice law in California.

The undisputed facts disclose that petitioner, who is 59 years old, graduated from Western State University College of Law in 1976, having passed the October 1975 professional responsibility examination. In December 1976 the Committee informed him that he had passed the

---

[1] Rule X, section 101(a) provides that "Every applicant shall be of good moral character.... The term 'good moral character' includes qualities of honesty, fairness, candor, trustworthiness, observance of fiduciary responsibility, of the laws of the state and the nation and respect for the rights of others and for the judicial process."

Fall 1976 bar examination, but that certification would be withheld pending its investigation of his moral character.

On April 21, 1978, the three-member subcommittee in charge of that investigation (Admission Rules, rule X, §§ 102(b), 108) conducted a hearing, at which Hall appeared with counsel and presented witnesses and documentary evidence. On July 26, 1978, the subcommittee filed a split decision, with two members concluding that Hall lacked the requisite good character for admission to the bar.

Hall submitted the case to the full Committee on the basis of the record before the subcommittee. On October 24, 1978, the Committee adopted the factual findings and conclusions of the subcommittee majority and denied certification. Three months later the Committee informed petitioner that he could request reconsideration in October 1979. This petition for review followed.

The Committee's decision to refuse Hall certification rested primarily on three findings:[2] (1) In 1974 the Bureau disciplined Hall in his capacity as manager of an employment agency for four incidents occurring in

---

[2]The subcommittee findings adopted by the Committee referred to several matters which we do not discuss in the text because we find them relatively insignificant: (1) Hall has been a party to five lawsuits, and would not admit wrongdoing as to those lawsuits. Two were suits by attorneys for fees they claimed were owed by Hall; in one case the court reached a compromise, with Hall paying part of the amount claimed by the attorney and each party bearing his own costs; in the other, Hall paid the amount claimed before the trial date and the case was dismissed. One was a suit against Hall for tort damages which has never been tried. One involved a claim by one employment counselor for a commission which Hall paid another counselor; judgment was for defendants. One involved a suit by Hall for assault and battery, which as Hall noted on his application was dismissed with prejudice; the Committee makes much of his inadvertent reference to "winning" that case in testifying before the subcommittee, but his affidavit responding to the subcommittee's findings credibly explains that slip as referring to an out-of-court settlement he reached with the defendants. (2) The Committee described Hall's testimony concerning his dismissal from his job as a flight engineer with United Airlines as indicating his belief "that apparently a conspiracy existed against him with a fellow flight employee lying against him." (Finding 16.) Neither the portions of the record cited by the Committee in support of that finding nor the record as a whole reveal the use of such language by Hall; his application states that a flight manager who incorrectly advised him regarding a licensing procedure later denied giving such advice, and he testified to that effect before the subcommittee, but his strongest characterization of the flight manager's denial was that he did not understand it. Moreover, even if Hall had alleged that the discharge reflected some sort of conspiracy, absent evidence showing that such testimony was not offered in good faith, it scarcely seems relevant to a consideration of his moral character.

1972-1974 which allegedly involved unethical fee collection practices;[3] (2) Hall's testimony concerning those incidents demonstrated a lack of remorse as to the alleged wrongdoing;[4] (3) Hall lacked the candor and respect for the law demanded of a practicing attorney.[5]

■ The applicant bears the burden of proving his good moral character. (Admission Rules, rule X, § 101(a).) Once the applicant has furnished enough evidence of good character to establish a prima facie case, the Committee may attempt to rebut that showing. (*Konigsberg* v. *State Bar* (1960) 366 U.S. 36, 41 [6 L.Ed.2d 105, 111, 81 S.Ct. 997].)
■ We turn, then, to the independent examination of the record which we must undertake in reviewing a certification denial, to determine whether applicant Hall has made his prima facie showing and if so whether the record contains sufficient evidence of bad moral character to rebut that showing. (See *Siegel* v. *Committee of Bar Examiners* (1973) 10 Cal.3d 156, 160 [110 Cal.Rptr. 15,514 P.2d 967]; *Hallinan* v. *Committee of Bar Examiners* (1966) 65 Cal.2d 447, 450-451 [55 Cal.Rptr. 228, 421 P.2d 76].)

The uncontradicted evidence of good moral character presented by Hall clearly establishes the requisite prima facie case. He had a distinguished Air Force record, receiving the Air Medal with five oak leaf clusters for his participation in thirty-five World War II combat missions; after the war, he served as an administrative officer, supervising two officers and twenty-five airmen and performing the duties of a squadron adjutant. During the Korean War he commanded a B-29. In 1953 he was honorably discharged as a first lieutenant.

---

[3]The disciplinary action taken by the Bureau consisted of placing Hall on probation for one year and suspending his license for twenty days. After the Bureau made its findings, which are discussed in detail below, Hall filed a writ of mandate to compel the Bureau to withdraw its suspension of his employment agency license. The superior court denied his writ and the Court of Appeal affirmed in *Hall* v. *Bureau of Employment Agencies* (1976) 64 Cal.App.3d 482 [138 Cal.Rptr. 725]. We denied a hearing in this matter.

[4]Finding 15, reached by the subcommittee and adopted by the Committee, stated that "In all matters Applicant failed to concede even in the slightest any mistake or wrongdoing, nor indicated any remorse for his actions." Findings 8 and 12 essentially repeated this allegation.

[5]Finding 17 stated the Committee's finding that Hall lacked "candor, honesty, and other essential qualities of good moral character...." Finding 15 alleged that Hall testified that his "experience could cause him to have a certain lack of respect for the judicial process."

Hall worked for 11 years as a flight engineer for United Airlines; has held a valid California license to operate an employment agency (except for the 20-day suspension hereafter discussed) since 1962; has lived at the same address since that year; and has been a good husband and father, raising 5 children, now all adults. Since 1974 Hall has continued to operate his employment agency on a full-time basis, attending law school at night until his graduation in 1976, and no complaints against him have been lodged with the Bureau.

Two witnesses presented by Hall at the subcommittee hearing testified that he possessed good moral character. Cecil A. Bulbeck, retired officer at the San Diego Trust and Savings Bank who had known Hall for approximately 10 years through Hall's transactions at the bank, described Hall as a "hardworking, industrious" person who· "really tried his best" for clients and handled his financial affairs "very well." Bulbeck also testified that he knew of nothing detrimental to Hall's honesty or character.

John E. Ballard, a private investigator who met Hall in 1972 when both began their studies at Western State Law School and had known him since as a friend, occasionally performing investigative services for Hall's agency, testified that he considered Hall "one of the most honest · men" he had ever met. He found Hall a "very straightforward person," who "always sticks up for what he believes," even in a classroom situation in which "maybe everybody in the class—including the teacher—would not agree with the particular point or what Hall felt was the [legal issue] in the case." Hall, Ballard stressed, "would always explain what he thought [the issue] was and support it with reasons why he felt it to be so, and...even when I think it worked to his detriment he never varied from saying what he felt was the truth in the matter." Ballard also stated that he had never known Hall to "misrepresent things." Both Bulbeck and Ballard recommended Hall for admission to the bar without qualification.

We conclude that this evidence sufficiently establishes Hall's prima facie case of good character. Indeed, the Committee did not conclude otherwise; as it informed Hall in April 1977, its investigation was confined to the disciplinary action taken by the Bureau for four counts of allegedly unprofessional conduct by Hall, arising from incidents occurring in 1972, 1973 and 1974. The Committee's ultimate decision to deny Hall admission, however, did not rest exclusively on the Bureau's

findings regarding those incidents. Rather, the Committee focused its attention on Hall's presumed "lack of remorse" for his past conduct, an attitude which it construed as signifying a disrespect for the law and concomitant unwillingness to adhere to an attorney's ethical obligations.

Hall challenges the Committee's interpretation of his stance regarding his prior conduct, arguing that evidence in the record corroborates his claim that his position reflected an honest disagreement with the substance of the Bureau's decision rather than a lack of remorse or respect for the law. To lay the groundwork for our evaluation of the Committee's conclusions, we summarize below the Bureau's findings[6] and the evidence offered by Hall to demonstrate the good faith basis of his refusal to display remorse in response to those findings.

## COUNT 1

*Bureau's charges and findings.*   Count 1 involved Mark Bryant, who in 1972 obtained a job as dispatcher with the Tony Sampo Equipment Rental Company upon Hall's referral. Bryant paid Hall only part of the fee to which he was entitled; the Bureau alleged that in attempting to collect the remainder Hall made "in excess of ten telephone calls" to the company, urging Bryant's employer "to pressure" Bryant to pay him. This action, the Bureau found, violated section 9993, subdivision (a) of the Business and Professions Code, which declares "unprofessional conduct" by employment agency personnel to be grounds for discipline.

The Bureau also charged Hall with urging the company to discharge Bryant so that Hall could supply a replacement and collect an additional fee. Bryant was fired after six months, but the Bureau found no support for the charge that Hall influenced that decision.

*Hall's evidence.*   Hall told the subcommittee that he had discussed Bryant's failure to pay his fee with Mel Clippinger, an employee at the equipment rental company who handled some personnel matters for Tony Sampo. Hall denied, however, asking Clippinger to help him collect the fee. Clippinger testified before the subcommittee that he did not recall receiving excessive or harrassing telephone calls from Hall. He was reminded and did not deny that he described the calls as a "nuisance" in the Bureau's 1974 proceedings; in context, however, that testimony appears to reflect Clippinger's irritation at Bryant for refus-

---

[6]The Bureau's findings are reprinted in full in *Hall, supra,* 64 Cal.App.3d 482, footnote 1 at pages 488-490.

ing to take the calls rather than any annoyance at Hall for making them.[7] Further, Clippinger's overall assessment was that Hall had been honest in his dealings with the company, and the record shows that Sampo continued to use Hall's agency to fill job openings after the Bryant episode.

Clippinger also testified that he signed a declaration dated January 21, 1974, which provides some support for Hall's claim that the Bureau's proceedings were tainted by the bias of its investigator Robert Warner (since deceased).[8] Warner prepared Clippinger's affidavit and asked him to sign it on February 14, 1973. In his subsequent declaration, Clippinger stated that before signing he told Warner several of the statements in the affidavit were not true, but Warner "assured me that was not important and said that the substance of the affidavit was true and I should go ahead and sign it."

## COUNT 2

*Bureau's charges and findings.* The Bureau alleged that Hall failed to make a refund to which his client Michael Rowray was entitled un-

---

[7]Questioned at the Bureau hearings about the nature of any phone calls he had received from Hall's agency, Clippinger replied "Well...with Mark [Bryant], he wanted the money, and it was a bother to me, you know, to take these calls; it was a nuisance. So I urged Mark very strongly to take positive action to take care of the situation because I didn't want to take these calls any longer. It was Mark's responsibility, not mine, to take care of it."

[8]Hall's allegations regarding Warner were supported by the testimony of another disinterested witness, James H. Bushman, an employee of Hall's at the time of the incidents in question. Bushman testified that he was contacted by Warner in 1973; Warner took Bushman's statement, and since Bushman could not be present for the hearings "promised [that Bushman] would receive a copy" of the prepared affidavit in the mail. Bushman, however, stated that he never received the affidavit. Bushman also testified that Warner "specifically stated in front of me and two other employees that he had been out to get Mr. Hall out of business for quite some time and he hoped that these statements could do it." Bushman further stated that Warner asked the three employees to testify that Hall did not comply with statutory requirements concerning coffee breaks and rest room availability, and that Bushman told Warner any such charges would be unfounded.

Another witness at the Bureau's hearing, Tony Sampo, who owned the equipment rental company that employed Mark Bryant and offered testimony relevant to the charges in count 1, told the subcommittee that he was a friend of Warner's.

The Committee acknowledged the testimony regarding Warner in finding 9: "Witnesses were presented by Applicant to the Subcommittee in an attempt to indicate that Applicant had indeed committed no wrong in the above-mentioned matter, and that in fact the allegations were trumped up charges of an overzealous, unscrupulous investigator of the Bureau." The relevance of such testimony in evaluating the significance of Hall's "lack of remorse" (see discussion at pp.743-745, *infra*) appears, however, to have escaped the Committee.

der Business and Professions Code section 9974.3, subdivision (a), and 9974.5, which require an employment agency to refund a specified portion of the referral fee on the request of a referred employee who leaves a job "for just cause" within 90 days of starting work. Rowray, the Bureau found, left his job in August 1972 after approximately 40 days because he did not receive a promised increase in salary. He then requested a refund from Hall and did not receive it;[9] Hall, the Bureau found, was therefore subject to discipline under Business and Professions Code section 9993, subdivision (h), which provides that an agency's failure to make a fee refund to which a referred employee is entitled is grounds for discipline. The Bureau did not expressly order Hall to refund the fee, however.

The Bureau's findings regarding count 2 concluded that, "by way of mitigation" regarding Hall's delay in making the refund, Rowray's conduct on the job was in part responsible for his failure to receive a raise, i.e., it was not entirely clear that he left his job for just cause.

*Hall's evidence.* Hall explained to the subcommittee that he delayed in making the refund to Rowray because he believed Rowray left his job without just cause[10] and therefore was not entitled to a refund under Business and Professions Code section 9974.5, *supra.* Hall also testified that he challenged the Bureau's authority to make a refund in the courts, but had lost track of Rowray by the time that challenge was rejected. The courts did not order Hall to make a refund.

Since the subcommittee hearing, Hall has determined the amount due Rowray, located Rowray (who had moved to another part of the state), and made the refund.

### COUNT 3

*Bureau's charges and findings.* The Bureau alleged that Hall improperly solicited a fee from his client Mercedes Ang after she accepted a position in June 1973 for which Hall did not have a job order. Ang, the Bureau found, was referred by Hall to the accounting firm of

[9]Hall has since made the refund; see page 738, *infra.*

[10]That belief was not unfounded; as noted above, the Bureau's findings referred to evidence suggesting that Rowray may have been less than a model employee: "By way of mitigation...it is found that some delay in the receipt of the aforesaid promised raise by said Rowray resulted from misconduct in the early period of his employment by said Rowray (too much talking on the job)."

Touche Ross & Company, and later hired by U.S. Financial Corporation as a bookkeeper on a referral from the California Human Resources Development Agency.

After Ang began work at U.S. Financial, the Bureau alleged, Hall telephoned her at her home and told her she owed him a fee for obtaining that job for her; he also made "numerous calls" to U.S. Financial and the state employment office claiming that she owed him a fee. Describing these telephone calls as "unreasonable and improper," the Bureau found Hall's conduct unprofessional in light of statutes requiring ethical account collection methods and declaring an attempted violation of professional rules grounds for discipline. (Bus. & Prof. Code, § 9993, subd. (a), in conjunction with Cal. Admin. Code, tit. 16, § 2857, subd. (c)(3)[11] and Bus. & Prof. Code, § 9993, subd. (c).) The Bureau concluded, however, that Hall did have a "reasonable basis" for attempting to verify whether Ang's employment resulted from his referral to Touche Ross, since U.S. Financial used Touche Ross as its accountant.

*Hall's evidence.* Hall testified to the subcommittee that he called Ang only to ascertain whether or not she had obtained her job at U.S. Financial as a consequence of his referring her to Touche Ross,[12] and denied making numerous calls to U.S. Financial demanding a fee. Three witnesses corroborated this testimony. All three witnesses, David L. Elliott, Theodore Bank, and Harold L. Turner, were employed by U.S. Financial at the time of the Ang incident and had been identified as the recipients of Hall's telephone calls by the company's personnel manager, Kenneth Matson, at the 1974 Bureau proceedings.

[11]The Bureau cited "§ 2875(c)(3)" of the California Administrative Code, title 16, as one basis for its finding that Hall was subject to discipline with regard to count 3. That citation is clearly erroneous, since section 2875 of the code contains no subdivisions; the Bureau apparently intended to cite either section 2875 or section 2857, subdivision (c)(3) of the code. Both the Court of Appeal (64 Cal.App.3d at p. 490) and the Committee adopted the citation as it stood and assumed that the Bureau meant to cite section 2875, which requires a written contract or receipt between employment agencies and applicants to be charged a fee. It is more likely, however, that the numbers 5 and 7 were inadvertently transposed than that the section reference was inadvertently added; we will therefore assume that the Bureau intended to cite section 2857, subdivision (c)(3)

[12]In response to questions about the basis of his claim that his referral enabled Ang to obtain her job at U.S. Financial, Hall explained to the subcommittee that because of the relationship between Touche Ross and firms such as U.S. Financial, the single referral to Touche Ross could be the basis for Ang's obtaining a job at U.S. Financial or any other company served by Touche Ross. That explanation is supported by the Bureau's finding that "a reasonable basis did exist' for Hall to inquire as to the possibility that his referral resulted in Ang's employment.

Elliott, assistant controller of the corporation at the time of the alleged calls, stated that contrary to Matson's testimony before the Bureau he had no recollection of having talked with Hall or of advising Matson that Hall had telephoned him to demand a fee. Elliott also identified a sworn statement that he had signed on August 22, 1975, in which he similarly denied receiving calls from Hall and informing Matson of such calls.

Bank, who was corporate accounting manager at U.S. Financial, recalled Ang as a company employee and testified that he had "no recollection of ever speaking to Mr. Hall until he subpoenaed me for an action a year ago," i.e., in 1977. In response to a specific question regarding Matson's testimony that Bank relayed information about Hall to him, Bank reiterated that he had never spoken to Hall and therefore could not have given any such information to Matson.

Turner, the company's controller at the time in question, also stated that he had received no calls from Hall and denied that he had ever notified Matson of a call from Hall concerning a placement fee for Ang. His only recollection concerning Ang was that he received a call *from* Matson to the effect that an agency had requested a fee for referring her.

## COUNT 4

*Bureau's charges and findings.* Hall referred Cyril Olbrich to fill a position as an engineer, with the fee to be paid by employer Century Design. Olbrich was hired; before he started work and thereafter, the Bureau found, Hall made several calls to Century Design regarding payment, and on one occasion used "subterfuge and a false name" to gain access to Olbrich in an attempt to expedite payment. The Bureau also alleged that Hall sought to make Olbrich the guarantor of the fee due Hall from Century Design by having Olbrich sign a copy of the referral contract. Concluding that Hall's behavior constituted "overreaching and unprofessional conduct (under Bus. & Prof. Code, § 9993, subd. (a), in conjunction with Cal. Admin. Code, tit. 16, § 2857, subd. (c)(3) and Bus. & Prof. Code, § 9993, subd. (g)), the Bureau nonetheless observed that Hall never sought to extract a fee from Olbrich and that Hall had a reasonable basis for concern regarding collection of his fee from Century Design.

*Hall's evidence.* Hall told the subcommittee that he had received a telephone request from Century Design for immediate placement. He therefore referred Olbrich to the company before having him take care of the necessary paperwork; he did, however, inform Olbrich that he would be considered responsible for the fee until Hall confirmed that the company would abide by its telephone promise to pay the fee. Hall had not previously dealt with Century Design.

Hall testified that he told Olbrich he would mail him the appropriate papers and did so, but Olbrich never returned a signed copy. These papers, Hall explained, were not a copy of his contract with the company; he had never had a written contract with Century Design, and the papers he asked Olbrich to sign reflected their separate agreement that the referral would be on an applicant fee basis until Hall obtained confirmation of Century's intention to pay.[13] Hall ultimately received payment from Century; he never demanded a fee from Olbrich.

Hall also testified that he made six to eight calls to Century Design, some in regard to the delay in paying his fee[14] and some in regard to changes in his standard fee schedule which the company wished to negotiate. Hall did not deny that on one occasion, before the company had paid the fee, he used a ruse to reach Olbrich by telephone at the company.[15]

In surveying the Bureau's conclusions and Hall's rebuttal evidence, we do not purport, of course, to redetermine Hall's actual guilt regarding the alleged prior misdeeds. That question was resolved by the Bureau and its decision is now final. We offer the foregoing summary,

[13]We note that under section 2859 of the California Administrative Code, title 16, a telephone call from an employer requesting a referral on an employer fee paid basis constitutes a bona fide job order. Olbrich testified at the Bureau's hearing, however, that he received a copy of a contract between Hall and Century Design and threw it away.

[14]Testimony before the Bureau indicated that Hall may have had reason to suspect an intentional delay by Century Design in paying him. The company's general manager, Steven Whalen, testified that he intended to postpone payment of the fee until Century Design determined whether or not Olbrich's work performance was satisfactory; and Hall was informed by the Company's secretary-treasurer, Mrs. Ruth Basso, that Whalen's approval would be a prerequisite for payment. Whalen also testified that the terms of his oral contract with Hall called for payment of a fee by Century Design if "qualified individuals" were referred.

[15]Hall's secretary testified before the Bureau that, after the switchboard operator at Century Design had been instructed to refuse calls from Hall to Olbrich, she offered to call Olbrich and tell the operator it was a personal call; she did so, and handed the phone to Hall after Olbrich identified himself to her.

rather, to provide a basis for our analysis of the sufficiency of the findings on which the Committee founded its denial of certification.

The Committee, as we have already noted, did not attempt to argue that the four incidents considered by the Bureau in its 1974 proceedings would suffice, as such, to justify a denial of certification.[16] Our review of the record confirms, as detailed below, that those incidents alone would not compel a refusal to admit Hall.

The Bureau itself had certain reservations as to the extent of Hall's misconduct, which were expressly noted in its findings; further, in shaping its disciplinary action, the Bureau chose not to revoke Hall's license but merely suspended it for a total of five days with regard to each separate count and placed Hall on probation for a year. We are also impressed by the fact that six years have elapsed since the last of the four incidents took place, during which time no complaints of any kind have been lodged against Hall with the Bureau or any other agency: even if Hall did behave in the manner described in the Bureau's findings, then the record contains no evidence that he has continued to engage in such conduct.

Finally, the misconduct described by the Bureau appears considerably less serious than the ethical breaches which have confronted us in cases involving other applicants refused certification by the Committee on grounds of wrongful prior conduct. As a summary of these decisions will reveal, we scrutinize the record closely in such cases and resolve each on the basis of its particular facts.

Thus, we have not hesitated to deny admission to an applicant who committed numerous fraudulent acts and repeatedly perjured himself in various proceedings. Similarly, we have refused to certify an attorney applicant who knowingly made false statements and omitted requested information in applying to take the attorney's exam. (*Bernstein* v. *Committee of Bar Examiners* (1968) 69 Cal.2d 90 [70 Cal.Rptr. 106, 443 P.2d 570]; *Greene* v. *Committee of Bar Examiners* (1971) 4 Cal.3d 189 [93 Cal.Rptr. 24, 480 P.2d 976].)

On the other hand, we have been more sympathetic toward applicants formerly subjected to discipline or punishment when the record disclosed convincing evidence of mitigating circumstances. We have ordered certification of an applicant whose record showed numerous ar-

---

[16]The Committee submitted that its conclusion concerning Hall's moral character rested on the record "as a whole."

rests for civil disobedience and participation in several fistfights, holding that "[w]hether these activities involve moral turpitude is dependent upon the issues involved and the motivation of the violator." (*Hallinan, supra,* 65 Cal.2d 447, 461.) We have also admitted an applicant who had given false testimony as to his prior membership in the Communist Party before the House Un-American Activities Committee and in union trial proceedings, and who later omitted those incidents in completing his registration as a law student and his application for admission to the bar. His rehabilitation as to these immoral acts was demonstrated, we found, by the "extraordinary quality" of the recommendations on his behalf and his "persuasive testimony regarding his views on the moral obligations of an attorney." (*March* v. *Committee of Bar Examiners* (1967) 67 Cal.2d 718, 732 [63 Cal.Rptr. 399, 433 P.2d 191].)

Most recently, we rejected the Committee's finding that an applicant "lied" to it by giving "evasive answers" and "incredible and unbelievable 'explanations'" regarding his statements in political speeches. (*Siegel, supra,* 10 Cal.3d 156, fn. 2 at pp. 159-160.) The Committee, we held, may conclude that an applicant lied in testifying as to the meaning of his previous utterances only where the Committee finds *"beyond any reasonable doubt"* that the applicant's version is both objectively false and advanced with an intent to deceive the Committee. (10 Cal.3d at pp. 178-179, (italics in original.)

In accordance with these precedents, the Bureau's minimal disciplinary action, and the lack of evidence that Hall has behaved improperly since that action, the Committee correctly assumed that it could not rely solely on the Bureau's findings as a basis for denying Hall admission. The Committee determined, however, that when those findings were buttressed with its conclusions alleging that Hall failed to display the remorse demanded of an applicant in his position and the candor expected of all applicants, that record as a whole mandated a denial of certification. For reasons touched on above and explored below, we reject that decision.

We find, first, that the evidence introduced by Hall at the subcommittee hearing effectively establishes that the attitude which the Committee perceived as a "lack of remorse" reflected his good faith belief in his innocence as to the Bureau's charges rather than any absence of respect for the judicial process. Nothing in the record suggests that Hall did not accept the binding legal effect of the Bureau's determina-

tion;[17] he did not violate the terms of the suspension, nor did he continue to engage in activity of the sort which the Bureau had found improper.

In light of these circumstances, Hall's consistent refusal to retract his claims of innocence and make a showing of repentance appears to reinforce rather than undercut his showing of good character. Precisely because the Committee made clear that Hall's chances for admission would be improved if he demonstrated remorse,[18] we find his refusal to do so indicative of good character rather than the contrary: Hall refused, in effect, to become the fraudulent penitent for his own advantage.

An individual's courageous adherence to his beliefs, in the face of a judicial or quasi-judicial decision attacking their soundness, may prove his fitness to practice law rather than the contrary. We therefore ques-

---

[17]The Committee's inferences to the contrary, Hall's arguments on appeal can scarcely be construed as demonstrating a lack of respect for the judicial process; the appeal in itself suggests his willingness to comply with the requirements imposed by law in seeking review of the Bureau's decision.

The Committee was also troubled by Hall's response to an inquiry by the subcommittee's alternate member asking whether the United States Supreme Court's refusal to grant certiorari in his appeal from the denial of mandate below might "cause him to have a certain lack of respect for the judicial process." Hall began by replying "Yes, I suppose a little bit," then went on to qualify that response at some length, indicating in the process his unfamiliarity with the law of federal jurisdiction rather than any lack of respect for the law: "Yes, I suppose a little bit. It might under the circumstances. I felt that the [Supreme Court] should have brought in witnesses [based on] the new information they got [in] the affidavit from the three executives, for example, from U.S. Financial...and perhaps it was procedure that they didn't allow it. I felt that wasn't quite fair to me, and I'm now—I don't know—I'm not as experienced in law as you perhaps. There may be some judicial law or appellate rule that [explains why] they didn't want to. I don't know why. I really don't understand it. All I know is what Craig and I talked about and [it looked to me as though] they had the authority to review it, but they didn't, and I don't know why."

[18]It is clear both from the Committee's brief and from the observations of its attorney on oral argument that Hall's failure to display remorse was a pivotal issue in its decision to refuse certification. In stressing that issue, the Committee apparently relied upon recent decisions concerning applicants and attorneys previously subjected to discipline in which we found that the willingness of those individuals to admit the impropriety of their behavior and demonstrate sincere remorse was an important mitigating factor in evaluating the action to be taken against them. (See, e.g., *March, supra,* 67 Cal.2d 718; *Schultz v. State Bar* (1975) 15 Cal.3d 799, 804 [126 Cal.Rptr. 232, 543 P.2d 600]; *Toll v. State Bar* (1974) 12 Cal.3d 824, 832 [117 Cal.Rptr. 427, 528 P.2d 35].) In these cases, however, the individuals neither asserted their innocence as to the conduct on which the prior disciplinary action was based nor offered evidence suggesting a good faith basis for such an assertion. Hall's case, as the discussion in the accompanying text indicates, presents an entirely different situation.

tion the wisdom of denying an applicant admission to the bar if that denial rests on the applicant's choosing to assert his innocence regarding prior charges rather than to acquiesce in a pragmatic confession of guilt, and conclude that Hall should not be denied the opportunity to practice law because he is unwilling to perform an artificial act of contrition.[19]

The Committee also attempted to reinforce its decision to deny certification by observing that Hall displayed a "lack of candor," an assessment in which only two members of the subcommittee had concurred.[20] Our examination of the record convinces us that, on the contrary, Hall possesses the requisite candor and honesty for admission.

In reaching that finding, we do not rely on our analysis of any isolated portion of the record. We are persuaded, rather, by the cumulative effect of a number of valid indicators, such as Hall's insistence on his innocence despite the subcommittee's obviously unfavorable reaction; the testimony of his character witnesses, whose credibility has not been questioned; the painstaking throughness with which he completed his application for admission, detailing every aspect of his past behavior which he must have known might give the Committee pause for thought; and his general willingness to discuss openly with the subcommittee members the incidents on which they examined him, including matters other than those he had been informed would be raised.

---

[19]Hall himself effectively illuminated the incongruity of the Committee's demanding a show of remorse in a case such as his, observing in his response to the subcommittee's findings, "Why should I have remorse when I didn't do those things I was accused of. That sounds like the person who was framed and railroaded to prison for several years, [then denied] parole...because he ha[d] no remorse."

[20]The finding that Hall lacked candor did not include a citation to portions of the record which might provide a basis for it. Language in the Committee's brief, however, suggests that it may be construing Hall's testimony concerning the Olbrich incident as demonstrating a lack of candor; it described his behavior in that incident as reflecting a willingness to "knowingly misrepresent the law" and "to [use] subterfuge in order to continue [his] harassments." Hall did not deny, however, that he allowed his secretary to use a stratagem to gain access to Olbrich; indeed, his testimony regarding that behavior, under rigorous cross-examination, consisted of a very candid attempt to explain why he permitted use of the ruse. He indicated to the subcommittee that it was difficult if not impossible for him to obtain information regarding payment of his fee from Century Design; that the switchboard operator would not permit him to speak either with Olbrich or with the person Hall's invoice identified (erroneously) as making the decision to hire Olbrich; and that he wanted to contact Olbrich because Olbrich had indicated that he would make an attempt to investigate the delay in payment.

We hold, then, that the Committee's findings attributing a lack of candor to Hall and inferring a lack of respect for the law from his declarations of innocence are not supported by the record, and may not be combined with a recitation of the Bureau's conclusions in an attempt to outweigh the decisive evidence of good moral character presented by Hall. The Committee's findings, taken together, do not suffice to justify its denial of certification.[21]

It is ordered that the Committee of Bar Examiners certify petitioner Willis Burdette Hall to this court as one qualified to be admitted to practice law.

Bird, C. J., Mosk, J., Manuel, J., and Newman, J., concurred.

**RICHARDSON, J.**—I concur in the result because, although the question is close, the totality of evidence does not so clearly indicate petitioner's lack of "good moral character" as to deny him admission to the Bar. In such cases I believe that all reasonable doubts should be resolved in favor of the applicant.

**CLARK, J.,** Dissenting.—I would affirm the committee's decision denying petitioner's application to be certified for admission to practice law.

---

[21] In view of this holding, we need not address Hall's contention that in handling his case, the Committee failed to comply with the time extension procedures specified in rule X, section 110 of the Admission Rules.