646 P.2d 1236

**Durlene Wilson NALL, Petitioner,**

v.

**BOARD OF BAR EXAMINERS, Respondent.**

**No. 13761.**

Supreme Court of New Mexico.

April 13, 1982.

Paul A. Phillips, Albuquerque, for petitioner.

E. H. Williams, Jr., Las Cruces, for respondent.

## OPINION

PER CURIAM.

New Mexico's Board of Bar Examiners (Board) recommended that Durlene Wilson Nall (Nall) not be admitted to the Bar of New Mexico. Under New Mexico's Rules Governing Bar Examiners, Bar Examinations and Admission to the Bar, Rule 8(b)(3), N.M.S.A.1978 (Repl.Pamp.1981), the Board found that Nall failed to establish that she was a person of good moral character. We accept the Board's recommendation.

Nall took the 1979 February New Mexico bar examination and passed. Nall's charac-ter and fitness for admission were called into question because of information contained in her application about several arrests for felonies and misdemeanors. A three member panel (Panel) of the Board held a hearing and made Findings of Fact and Conclusions of Law recommending that Nall not be admitted to practice in New Mexico.

Six items were inquired into by the Panel.

1. Nall was indicted and convicted for conspiracy to transport stolen securities interstate. Nall's conviction on this charge was reversed in *United States v. Nall*, 437 F.2d 1177 (5th Cir. 1971).

2. In 1979, Nall, agent-manager of the Organ Mountain Lodge, and her employees were arrested for dancing nude at the Organ Mountain Lodge in Dona Ana County.

3. There were allegations that Nall assisted one of her employees in connection with the employee's divorce.

4. In 1979, Nall danced nude at the Cheyenne Club in El Paso, Texas.

5. In 1979, Nall was arrested and charged with driving while intoxicated and with the illegal possession of dangerous drugs. The charges were dismissed.

6. In 1975, Nall was arrested and charged with conspiracy to sell heroin, in Denver, Colorado. The Panel concluded that Nall was "culpably involved in a conspiracy to sell and the attempted sale of heroin to undercover officers."

In regard to the first five items, the Panel did not find that any one or all five together were sufficient to find that she failed to prove that she was of good moral character.

In regard to the sixth item, the Panel made the following conclusions that were accepted by the Board:

■ The Applicant has failed to demonstrate to the satisfaction of the Board of Bar Examiners that she is a person of good moral character, entitled to be admitted to the Bar of New Mexico.

174

■ Failure and refusal of Applicant to truthfully and candidly testify before the Bar Examiners' Panel as to her knowledge and participation in the Denver incident hereinbefore outlined directly, adversely and substantially reflects upon the moral character and fitness of Applicant to practice law in New Mexico.

■ Applicant has failed to demonstrate that since the Denver drug incident, she has rehabilitated herself and now has the good moral character and fitness which are required to practice law in New Mexico.

The facts of the Colorado incident are in dispute. The Colorado State Bureau of Investigation undercover police officers' Kenneth Brown (Brown) and Carl Whiteside (Whiteside); version of the facts are as follows. The incident began when Brown contacted Nall's former husband Alan Wood (Wood) while she and Wood were separated. Wood owned an interest in a bar that Brown said he wanted to purchase. During the period when they were negotiating the purchase, Brown told Wood that he wanted to purchase any drugs which Wood could get in "large quantities". While stringing Wood along on the purchase of the bar, Brown began negotiating the purchase of drugs from Wood. Wood asked him if he was interested in buying seven and one-half (7½) kilos of cocaine and ten (10) tons of marijuana. The two negotiated a price. Before anything was settled, Brown told Wood he had to leave for Denver.

Wood, during this time, called Nall who was working in California and told her he may have a buyer for the bar they had an interest. Nall flew to New Mexico to handle the preparations and signing of the papers to close the transaction.

The afternoon before leaving for Denver, Brown telephoned Wood's number. Nall answered the telephone. She introduced herself to Brown, and told him that "He [Wood] has what you want."

Upon arriving at the Denver airport, Wood introduced both officers to Nall. Nall stated to the officers, "You people are either mafia or super cops; Al [Wood] has told me a lot about you and the transactions that are taking place."

After being taken to a hotel, Wood explained to the officers that he had set up a different deal. Wood stated that he had thirty-four (34) ounces of heroin for sale. The next morning, Nall told one of the officers that she had been awakened by a telephone call very early and had also been awakened by the guy who brought the "taste".[1]

After Wood had obtained the "taste", the officers, Wood and Nall spent two or three hours in a normal size hotel room. Wood and Brown were on one side of the room conversing about the narcotics transaction and Nall and Whiteside were on the other side of the hotel room talking about "property".[2] Whiteside, who was talking to Nall, testified, "She never specifically ever mentioned the word heroin but she talked about, there's a lot of money involved in it; I know what's going on; be patient, the thing will come together." Numerous telephone calls were made to Davenport, the drug connection in Colorado Springs, during this time. The phone conversations were within the presence of Nall, Wood, Brown and Whiteside. The words "property" and "smack"[3] were referred to during the telephone conversations. Nall also made one of the telephone calls to Davenport, on the instruction of Wood, and during the conversation referred to the "property". Whiteside testified, "I didn't mention the word heroin but Brown mentioned the word smack, and in the telephone conversations that he had with Davenport, that Al Wood had with Davenport in the presence of Durlene [Nall], it was obvious we were talking

1. "Taste" is an expression in the drug trade for "sample" according to the undercover officer.

2. The officers testified that "property" was a code word that meant drugs and was used instead of referring to the specific drugs.

3. "Smack" is another word used in the drug trade instead of heroin according to the undercover officers.

about anything but real estate property." Whiteside also testified that it "had to be blatantly obvious to everybody. We were talking about how many pounds, how many kilos, what kind of profit would be made. Property isn't divided into kilos and pounds, it's acres and parcels and things like that."

Later, the sale fell through, and Nall and Wood were placed under arrest for conspiracy to sell heroin. However, Brown testified that just before the arrest, in the presence of Nall, Wood and two other undercover police officers, he reviewed the details of the drug deal. The words "smack", "34 ounces" and "taste" were used in the conversation.

After the arrest, a deal was later made with Wood that the Denver authorities would drop the charges if Wood cooperated and gave information to the Albuquerque Police Department about other crimes. Wood cooperated and the charges were dropped.

Nall disputes the officers' testimony and assumptions and denies knowing anything about the drug transaction. She testified that while she did not deny saying that the officers were either super cops or mafia, she did not remember saying it. She also testified that she never heard or used the word "taste". Also, any conversations going on between Brown and Wood were on the other side of the room, and she did not hear them. She stated that during the two to three hours in the hotel room, she and Whiteside talked about shopping centers, subdivisions and real property prices. Whiteside told her that he was an accountant and had no authority to make decisions as to whether the properties could be purchased or not and that he felt the whole thing would blow up. Nall did tell him to be patient, but said she was referring to the sale of the bar property. Nall did testify that she placed *one* telephone call during this period but that it was to get the weather report in Colorado Springs for Brown. She also testified that she did not know if the word "smack" was used in her presence; however, at that time, she did not know what it meant and did not ask.

At the time of the arrest, Nall stated that there was no conversation first, but rather the officers came through the door; and the first thing they did was to pull their guns. She insists that Brown never talked about the drug transaction in her presence. She claims that the first time she heard about the transaction was at the preliminary hearing.

Nall also testified that she did not know what was going on in the hotel in Denver and that she had no knowledge of the deal between Wood and the police to dismiss charges until after the deal had been confirmed and the charges were dropped.

██ The Board adopted the Panel's recommendation by an unanimous vote and recommended to this Court that Nall's admission be denied. The Board's decision is a recommendation to the New Mexico Supreme Court. N.M.R. Bar Examiners 10(d), N.M.S.A.1978 (Repl.Pamp.1981). The Supreme Court has the ultimate responsibility to grant or withhold an admission to practice law. *Lucius v. State Board of Bar Examiners*, 84 N.M. 382, 503 P.2d 1160 (1972). Therefore, we are not bound by the Board's findings; although, the Board's findings are accorded great weight. *Siegel v. Committee of Bar Exam., State Bar of Cal.*, 10 Cal.3d 156, 110 Cal.Rptr. 15, 514 P.2d 967 (1973); *Greene v. Committee of Bar Examiners*, 4 Cal.3d 189, 93 Cal.Rptr. 24, 480 P.2d 976 (1971). This Court must independently examine and weigh the evidence and then pass upon its sufficiency. *Id.* A particular case must be judged on its own merits, and an ad hoc determination in each instance must be made by this Court. *Application of Klahr*, 102 Ariz. 529, 433 P.2d 977 (1967).

One of New Mexico's requirements is that the applicant must prove that she "is a person of good moral character ... fit to practice law." N.M.R. Bar Examiners 8(b)(3). The United States Supreme Court has held that a "State can require high standards of qualification, such as good moral character ... before it admits an applicant to the bar, but any qualification must have a rational connection with the

applicant's fitness or capacity to practice law." *Schware v. Board of Bar Examiners,* 353 U.S. 232, 239, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957).

The burden is on the applicant to prove good moral character. The Board then has the opportunity to rebut, showing evidence of bad moral character. *Greene, supra.* The applicant also has the burden of showing that the Board's findings are not supported by the evidence or that the decision was erroneous or unlawful. *Siegel, supra.* Reasonable doubts are resolved in favor of the applicant. *Id.; Hallinan v. Committee of Bar Examiners of State Bar,* 65 Cal.2d 447, 55 Cal.Rptr. 228, 421 P.2d 76 (1966).

We have read the entire record and thus, exercising our independent judgment as to the weight of the evidence, we agree with the recommendation of the Board that Nall does not possess the good moral character required of an applicant for admission to the New Mexico Bar.

IT IS SO ORDERED.