2007-NMSC-022

159 P.3d 245

**In re APPLICATION of Elliot B. OPPENHEIM for Admission to the Bar.**

**No. 29,655.**

Supreme Court of New Mexico.

Feb. 9, 2007.

Rehearing Denied May 10, 2007.

Ray Twohig, Ray Twohig, P.C., Albuquerque, NM, for Petitioner.

Sarah M. Singleton, Andrew S. Montgomery, Montgomery & Andrews, P.A., Santa Fe, NM, for Board of Bar Examiners.

## OPINION

BOSSON, Justice.

{1} Petitioner Elliot Oppenheim ("Oppenheim") petitions this Court to review the State Board of Bar Examiners' ("the Board") denial of his application for admission to the New Mexico Bar ("the Bar"). The Board found that Oppenheim failed to carry his burden of establishing that he was a person of good moral character. *See* Rule 15–103(C) NMRA. In his petition, Oppenheim challenges the findings of the Board and the adequacy of the administrative procedures used by the Board in conducting its investigation and hearings; the constitutionality of the good moral character standard; and the Board's assessment of its attorney fees against him. We hold that the administrative procedures were adequate and the good moral character standard is constitutional. We therefore accept the Board's recommendation against Oppenheim's admission to the Bar. However, we reject the assessment of attorney fees against the applicant.

## BACKGROUND

{2} Oppenheim's background, as developed in the record over the nearly seven years of proceedings on his two applications for admission to the Bar, is replete with instances of dishonesty and unprofessional conduct on which the Board legitimately based its recommendation. We consider the facts developed in connection with both applications because the Board was entitled to consider what, if anything, had changed since it denied Oppenheim's first application.

{3} Oppenheim was born in New York in 1947, and received a medical degree from the University of California at Irvine in 1973. He was licensed to practice medicine in the States of California and Washington beginning in 1974.

{4} Beginning in 1978, Oppenheim used his medical license to procure cocaine for his

own use and for distribution to another. Oppenheim was convicted in 1980 of two felony counts: one of acquiring a controlled substance (cocaine) by misrepresentation, fraud, and deception in violation of 21 U.S.C. § 843(a)(3), and one of distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1).[1] He received a three-year suspended sentence, was placed on probation for three years, and was ordered to undergo psychiatric treatment and to perform 600 hours of community service. He successfully completed his sentence in 1982.

{5} Oppenheim's Washington medical license was revoked in 1980 on the basis that he had been convicted of "a crime involving moral turpitude, dishonesty and corruption in the course of his practice as a physician." His Drug Enforcement Administration registration and hospital privileges were also revoked. His California medical license was revoked on similar grounds in 1981.

{6} In 1981, Oppenheim's medical license was conditionally reinstated in Washington, although his hospital privileges were not restored.[2] In May of 1991, the Medical Disciplinary Board summarily suspended Oppenheim's medical license based on charges that (a) he had not appropriately treated a patient with emotional and mental problems, resulting in her hospitalization; and (b) he had incorrectly intubated an unconscious patient, shortly after which the patient died. In June of 1981 the suspension was conditionally stayed upon Oppenheim's stipulation that the state could prove the facts with which he had been charged.[3]

{7} In December 1991, the Medical Disciplinary Board charged Oppenheim with numerous acts of dishonesty in connection with his testimony as an expert witness in courts throughout the country, including New Mexico. Oppenheim was charged with affirmatively misrepresenting and failing to disclose adverse facts affecting his credibility as a witness, including his criminal convictions

and license revocations. Oppenheim's lack of candor in these cases resulted in dismissal of several suits at or on the eve of trial. One court informed him that it would refer his testimony to the disciplinary board, the Washington attorney general's office, and the district attorney for investigation of allegations of perjury, fraud, and violation of the Consumer Protection Act.

{8} Oppenheim failed to appear at his disciplinary hearing, informing the Medical Disciplinary Board by letter that he had chosen not to renew his license but was protesting the disciplinary hearings against him. The Medical Disciplinary Board proceeded to hear the evidence against him and, in early 1993, entered extensive, substantive findings of fact.[4] The Medical Disciplinary Board concluded that Oppenheim had committed multiple acts of (a) moral turpitude, dishonesty, or corruption relating to the practice of his profession; (b) misrepresentation or fraud in the conduct of his profession; (c) failure to comply with a disciplinary order or assurance of discontinuance; and (d) other aggravating factors. On the basis of these findings and conclusions, the Medical Disciplinary Board revoked Oppenheim's Washington medical license, barred him from applying for reinstatement for at least 20 years, imposed a $43,000 fine, and ordered him to make restitution to the lawyers and litigants he had harmed.

{9} Later in 1993, Oppenheim and the Medical Disciplinary Board stipulated to an agreed order relating to his financial obligations under the Board's prior order, including the fine and the restitution obligations. The order established a payment schedule and provided that a portion of the amount due would be waived if he timely made all other payments, but it also provided that any attempt by Oppenheim to discharge his financial obligations in bankruptcy would result in the full unpaid balance becoming due immediately.

1. In his second application, Oppenheim disclosed some but not all of these statutory violations.

2. Oppenheim's second application omits the conditional nature of this reinstatement.

3. Oppenheim's second application states that his license was reinstated and does not disclose that he stipulated to the agreed facts.

4. Oppenheim's second application represents that his case was never heard on the merits.

{10} Oppenheim declared bankruptcy in 1995. Among the $386,651 in liabilities that he sought to discharge were unpaid fines and restitution obligations of $50,250 owed to the Washington Medical Disciplinary Board. The Washington attorney general has informed Oppenheim that his debt to that Board was not discharged in bankruptcy.[5] Oppenheim has not paid the debt and no longer feels any obligation to pay it.[6]

{11} Even before his medical license was revoked, Oppenheim indicates that he had decided he no longer wanted to be a doctor, so he went to law school and received his J.D. from the Detroit College of Law in 1995, and an LL.M. in health law from Loyola University in 1996. Oppenheim applied for admission to the Washington State Bar in 1996. In November of 1996, the Character and Fitness Committee of the Washington State Bar Association ("the Washington Committee") conducted a full hearing, reviewing evidence of the events described above. The Washington Committee took note of "repeated instances of dishonesty, fraud and deception evidenced by false sworn testimony in judicial proceedings."

{12} The Washington Committee also reviewed records of twenty-one civil lawsuits to which Oppenheim had been a party, above and beyond the cases in which he had testified as an expert witness, the professional disciplinary proceedings, the bankruptcy proceeding, and two marriage dissolution proceedings. A number of these lawsuits involved allegations that Oppenheim had intentionally or negligently converted property of another, that he had taken property or embezzled funds, or that he had committed acts of dishonesty, harassment, or "unclean hands." In one of these suits, Oppenheim was sanctioned for filing a frivolous claim against his former wife to recover property that he did not own and had not listed as an asset in his bankruptcy proceeding.

{13} The Washington Committee commented that Oppenheim's demeanor during the hearing left it with "serious reservations concerning his forthrightness and candor." It later became clear that Oppenheim had lied in his testimony to the Washington Committee, testifying that he was "never an expert," although he had been deposed and testified to expert physician opinions in two lawsuits, one only four weeks earlier. Based on the evidence before it, the Washington Committee concluded that Oppenheim had failed to show that he was of good moral character, and it declined to recommend his admission to the Washington Bar.

{14} In 1997, less than a year after being denied admission to the Washington Bar, Oppenheim applied for admission to the New Mexico Bar. Oppenheim was represented by Briggs Cheney from that time through January 2002. Claude Jack represented him from April to approximately August 2002. In November 2002, Oppenheim wrote letters to the Disciplinary Board of the New Mexico State Bar and the Board of Bar Examiners complaining that Jack had charged him $20,000, had provided him nothing of value, had been "floridly dishonest," and had engaged in unethical conduct. He claimed that unless Jack refunded his fees, he would not be able to afford another attorney's retainer and would be forced to withdraw his Bar application.[7] The Disciplinary Board found insufficient evidence to support Oppenheim's allegations against Jack. After Jack submitted an affidavit attesting that his fees were less than $14,200 and the total amount billed was only $15,000, Oppenheim admitted that his contrary allegations were inaccurate. The Character and Fitness Panel later found that Oppenheim's actions reflected a substantial lack of candor and lack of judgment, and raised serious questions about his ability and willingness to work with professionals.

5. Oppenheim stated in his second application that he believes the debt was discharged in bankruptcy.

6. Oppenheim represented to the Washington State Bar Association in 1996 that he felt "very" ethically bound to meet his obligation to the Medical Disciplinary Board and that he would be willing to pay full restitution in the future. Further, he represented to the New Mexico Character and Fitness Panel in his first application in 1998 that when the Medical Disciplinary Board imposed financial obligations, he felt a profound obligation to meet them.

7. However, Oppenheim retained his present counsel only two weeks later.

{15} In 1999, Oppenheim became intimately involved with a married woman who had been separated from her husband for over a year. Oppenheim rendered legal assistance to this woman in petitioning for a divorce by obtaining and preparing the divorce papers for her. The Panel later found that by doing so Oppenheim had demonstrated a "serious lack of substantive respect for observance of the rule and the spirit of the law and the legal profession."

{16} In early 2001, Oppenheim was sharing a house with Claudia Upton, a woman he had met in law school. Upton obtained a temporary restraining order requiring Oppenheim to vacate the house immediately, and the sheriff served the order on Oppenheim the night of February 18. Oppenheim did not comply with the order and was arrested the next day and charged with a misdemeanor for violating the order. The Panel found that his failure to comply with the court's order was unlawful and without legal justification, and indicated a lack of respect for the rule of law.

{17} Oppenheim and Upton became involved in acrimonious litigation over the house and some personal property as well as allegations of domestic violence. Upton filed for bankruptcy in July of 2002, listing Oppenheim as a creditor. Oppenheim responded by writing letters to state and federal law enforcement agencies, Upton's mortgage lender, her employer, and her bankruptcy attorney, in which Oppenheim accused Upton of fraud and criminal acts. Oppenheim also threatened to inform the Texas State Bar if Upton's bankruptcy attorney did not immediately withdraw from representing Upton. Upton moved for sanctions against Oppenheim for violation of the automatic stay in the bankruptcy court. Oppenheim then consented to an agreed order resolving the motion for sanctions, under which Oppenheim was ordered to cease any further communication in any manner regarding Upton, whether individually or through any third party; Upton agreed to convey three pieces of jewelry to Oppenheim; and Oppenheim relinquished any remaining claim in the bankruptcy. The Panel later found that Oppenheim had deliberately and wrongfully withheld information from both the Board and Mr. Twohig relating to the motion for sanctions and the ensuing agreed order.

{18} Oppenheim has been involved in several civil disputes brought by or against his medical-legal consulting business known as coMEDco. One such action, brought by New York attorney Craig Snyder, involved coMEDco's consulting fees. The action was settled, but the Panel later found that Oppenheim's disclosure of the matter on his bar application was incomplete and misleading. In his application, Oppenheim stated that under the settlement agreement Snyder agreed to pay Oppenheim $13,000 in fees, but Oppenheim did not disclose the entirety of the agreement which provided that Snyder would pay Oppenheim "the lesser of $13,000 or 10% of any recovery." Another case involved a fee dispute with Marvin Cohen, who alleged that Oppenheim had obtained his credit card information and charged him $1,500 for work that was never performed. Oppenheim claimed he had consulted with two attorneys representing Cohen, but both attorneys denied that he had ever spoken with them, and the Panel later found that he had not.

{19} Oppenheim held himself out publicly as both a physician and a lawyer, long after his medical license had been revoked and without ever having obtained a law license. For example, sometime in 2000, Oppenheim posted an advertisement on his website for coMEDco representing that he was a physician and a lawyer. He disavowed responsibility for this misrepresentation and said he did not know how it occurred. Oppenheim also authored a magazine article, published in September of 2000, representing that he had "work[ed] as a physician for twenty years, then becoming a lawyer," and that he was a "[p]hysician and attorney." These representations he blamed on the magazine's editors. Similarly, a personal advertisement represented that Oppenheim "was a physician for nearly twenty years and then became a lawyer," and invited the reader to view his coMEDco website. These representations Oppenheim blamed on Ms. Wright and Ms. Upton, claiming that the two of them had "doctored" the document. The Panel found

that Oppenheim had deliberately or negligently presented himself to the public as a physician and a lawyer without plausible excuse, indicating a serious lack of respect for observance of the rule and spirit of the law and the legal profession.

## PROCEEDINGS ON OPPENHEIM'S SECOND APPLICATION

{20} Oppenheim's first application and the record of proceedings on that application, though not challenged at that time, are part of the record here. The record on Oppenheim's first application is replete with instances of failure to disclose material information on his application. Indeed, at the end of those proceedings, Oppenheim himself acknowledged:

> I know that you turned up a bunch of very unfavorable information at the end of this hearing. I suppose I should have read my own CV and should have prepared that better. Obviously I did not disclose fully and thoroughly and candidly and, yet again, I find myself apologizing for that. I am ashamed and humiliated. I should read my own CV and should have come forward with that information.... And I am sure that you're going to deny this application, and I think that that's just. The evidence supports that, but maybe the next time it won't.

Oppenheim challenged those proceedings "collaterally" during the administrative hearing on his second application.

{21} Oppenheim filed his second application for admission in September of 2000, and filed several supplements to that application during the course of the Board's proceedings. The Character and Fitness Panel ultimately conducted three evidentiary hearings on this application, but before doing so, the Panel granted three successive continuances of earlier hearing dates, all at Oppenheim's request. The Board gave Oppenheim prior notice of the subject, purpose, time, and place of the hearings.

{22} The Board periodically assessed Oppenheim pursuant to Rule 15–105(A)(3) NMRA what the Board deemed to be its reasonable expenses, including attorneys fees and costs, in connection with its investigation and hearing on Oppenheim's application.

Oppenheim partially paid these amounts, but disputed that he was obligated to pay them.

{23} After the three hearings on Oppenheim's second application, the Character and Fitness Panel recommended that Oppenheim be denied admission to the Bar. The Panel made Findings of Fact, Conclusions of Law and a Recommended Decision, which were adopted unanimously by the Board at its November 19, 2005 meeting. The Board also made additional Findings of Fact and Conclusions of Law.

{24} The Board concluded that Oppenheim's conduct over a long period of time and in a wide variety of situations gave it substantial pause and concern that his admission to the Bar could be detrimental to the integrity of the Bar, the administration of justice, and the public interest. The Board took note of the past record, summarized in the Board's findings from the 1998 proceedings, of conduct by Oppenheim calculated to "deceive, mislead, and victimize the public."

{25} The Board observed that the issue for purposes of the present proceeding was whether Oppenheim had carried his burden of proving good moral character and rehabilitation sufficient to overcome the doubts raised by his past misconduct. The Board emphasized that the applicant "must demonstrate not only by words but also by deeds that he or she can undertake the practice of law without endangering the public or the reputation of the profession." The Board concluded that Oppenheim had not carried this burden, but, to the contrary, he continued to engage in a pattern of deliberate deception and withholding of material information. The Board also determined that Oppenheim was obligated to pay the Board's reasonable attorney's fees and costs attendant to the hearings on his application for admission and found that the fees billed by the Board's counsel at a reduced $75.00 per hour rate were necessary and reasonable. Finally, the Board recommended that Oppenheim not be permitted to reapply for admission to the Bar for at least five years.

## STANDARD OF REVIEW

{26} This Court exercises its constitutional power of superintending control

when it establishes and enforces standards of qualification for admission to the Bar. N.M. Const. art. VI, § 3; *In re Treinen,* 2006–NMSC–013, ¶ 6, 139 N.M. 318, 131 P.3d 1282. It is up to this Court to vindicate New Mexico's "compelling interest in the calibre and integrity of persons which it allows to practice within its boundaries." *In re Adams,* 102 N.M. 731, 732, 700 P.2d 194, 195 (1985). The most recent case setting forth the standard of review for denials of admissions to the Bar was *Nall v. Board of Bar Examiners,* 98 N.M. 172, 646 P.2d 1236 (1982). In that case we stated as follows:

> The Board's decision is a recommendation to the New Mexico Supreme Court. The Supreme Court has the ultimate responsibility to grant or withhold an admission to practice law. Therefore, we are not bound by the Board's findings; although, the Board's findings are accorded great weight. This Court must independently examine and weigh the evidence and then pass upon its sufficiency. A particular case must be judged on its own merits, and an ad hoc determination in each instance must be made by this Court.

*Id.* at 175, 646 P.2d at 1239 (cited authority omitted). We take this opportunity to bring the standard of review articulated by *Nall* in line with recent developments in our standard of review in the disciplinary context. In *In re Bristol,* 2006–NMSC–041, 140 N.M. 317, 142 P.3d 905, we noted that "[b]ecause the hearing committee directly observes witness testimony, it is in the best position to weigh the evidence, resolve matters of credibility, and choose between the conflicting inferences that may be drawn from the evidence." *Id.* ¶ 15. Therefore, "we view [the hearing committee's] role much the same as any other fact finder that should be given deference on questions of fact." *Id.* ¶ 16.

{27} The Board occupies a position in the bar admissions context parallel to that of the hearing committee in the disciplinary context, and thus we should accord a similar level of deference to the Board's findings of fact. Because the Board directly observes witness testimony and is in the best position to weigh the evidence, resolve matters of credibility, and choose between the conflict-ing inferences that may be drawn from the evidence, we will defer to the Board on matters of weight and credibility, viewing the evidence in the light most favorable to the Board's decision and resolving all conflicts and reasonable inferences in favor of that decision. *See id.* However, we are not bound by the Board's legal conclusions and recommendations and will independently review such matters under a de novo standard. *Id.* ¶ 18.

{28} Despite the limitation on our discretion to weigh the evidence, we nevertheless retain our authority to independently decide whether the evidence is sufficient to deny an applicant admission to the bar. *See id.* ¶ 27 (noting that this Court retains its discretion to independently decide whether a given set of facts, viewed in the light most favorable to the decision below, warrant disciplinary sanctions). We emphasize that " 'no person applying for admission on motion has, under our rules, an absolute right to be admitted. [The applicant] must satisfy this court that he is qualified in all respects so as to meet the high standards of the New Mexico Bar.' " *Lucius v. State Bd. of Bar Exam'rs,* 84 N.M. 382, 385, 503 P.2d 1160, 1163 (1972) (quoting *Rask v. Bd. of Bar Exam'rs,* 75 N.M. 617, 625, 409 P.2d 256, 262 (1966)).

{29} Based on our review of the record, giving the required deference to the findings below, we find that the Board's Findings of Fact and Conclusions of Law were supported by substantial evidence. We agree with the Board's determination that Oppenheim has not carried his burden to show that he is of good moral character and fit to practice law in this state.

## ADEQUACY OF ADMINISTRATIVE PROCEDURES

{30} Most of the evidence of Oppenheim's past misconduct is uncontested. Oppenheim's main strategy to address his less than complimentary record is to claim that he is fully rehabilitated. In support of this claim, Oppenheim relies heavily on the testimony of his therapist, Ned Siegel, a clinical psychologist. Yet, Dr. Siegel repeatedly and un-

equivocally denied that he had any special qualification to opine on Oppenheim's character and fitness, or that he was any better "than a man on the street" at predicting whether Oppenheim's future conduct would show good moral character. Oppenheim also offered his own testimony in support of his rehabilitation, claiming that he "come[s] from good stock" and that he has demonstrated his motivation by "beating on this door for a long time." However, the moral character of Oppenheim's parents and his persistence in trying to obtain his license to practice law have little bearing on his own good moral character as required for admission to the Bar. *See, e.g., In re Ayala,* 112 N.M. 109, 110, 812 P.2d 358, 359 (1991) (per curiam) ("The mere passage of time or a statement that one wishes to resume a legal career will not suffice as a basis for reentry into the profession."). Oppenheim's other witnesses supported his application "primarily by describing his candor and forthrightness, his honesty, his dedication and his kindness." Overall, however, Oppenheim presented little in the way of concrete acts or conduct that demonstrate his rehabilitation. *See In re Ayala,* 112 N.M. at 110, 812 P.2d at 359 (A candidate for reinstatement "bears a heavy burden and must demonstrate not only by words but also by deeds that he or she can undertake the practice of law without endangering the public or the reputation of the profession."). The facts show the opposite—repeated conduct evidencing a lack of candor, honesty, or respect for the law.

■ {31} The bulk of Oppenheim's arguments to this Court focus on alleged deficiencies in the administrative process and not on the factual background discussed above. Oppenheim claims that the Board frequently engaged in "trial by ambush," failing to provide him with notice of the charges against him. Rule 15–301(C) sets forth the notice requirements for character and fitness hearings. That provision reads:

> **Hearings.** The board may hold a hearing on the qualifications of any applicant. The hearing may be held by a committee of the board consisting of not less than three members of the board. The chair of the board or any member of the board appointed by the chair shall chair the committee. The applicant shall be advised of the nature of the subject and purpose of the hearing and may cross-examine witnesses, be represented by counsel and present evidence in the applicant's behalf. A record shall be made of all committee hearings.

{32} The Board fully complied with the rule, giving Oppenheim adequate advance notice of the subject, purpose, time, and place of every session of the hearing and granting him continuances of hearing dates when he requested them. *See Lucius,* 84 N.M. at 386, 503 P.2d at 1164 (holding that applicant was not denied procedural due process where the Board afforded him "a full hearing with ample opportunity to present evidence and testimony in his behalf" and, in addition, the "opportunity to present documentary evidence ... in his original application and his 'additional statement' "). Further, most, if not all, of the issues were first raised by Oppenheim himself, by his answers to questions presented in his application for admission to the Bar or supplements thereto; the Board simply investigated these issues as it is required to do. *Cf. Willner v. Comm. on Character & Fitness,* 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963) (holding applicant was denied due process when committee relied on ex parte statements in denying applicant's admission and did not apprise applicant of its reasons for denial at any point in the proceedings). The record shows that the Board afforded adequate due process, and in fact went to great lengths to assure that Oppenheim knew what issues were being considered and was given every opportunity to provide an explanation. The Board ordered discovery even though no discovery was required, granted several continuances at Oppenheim's request, and conducted three evidentiary hearings.

## CONSTITUTIONALITY OF THE GOOD MORAL CHARACTER STANDARD

■ {33} Oppenheim argues that the standard of "good moral character" is unconstitutionally vague, claiming that the requirements for good moral character "are not established or itemized as a matter of law, and thus their proof is a virtual impossibili-

ty." However, the U.S. Supreme Court has squarely rejected that contention, noting that long usage has given well-defined contours to the good moral character requirement and that all 50 states, the District of Columbia, Puerto Rico, the Virgin Islands, and the U.S. Supreme Court require similar qualifications. *See Law Students Civil Rights Research Council, Inc. v. Wadmond*, 401 U.S. 154, 159–60, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971).

{34} Significantly, Rule 15–103, which sets forth the necessary qualifications for admission to the Bar including the good moral character standard, was amended on September 1, 2005 to include specific factors that should be considered in evaluating character and fitness of applicants. Although this amendment was not in effect at the time of Oppenheim's application, Oppenheim states that "he welcomes consideration of his present character and fitness under the specific criteria established in Rule C(4)." Oppenheim then goes on to list "key points" that emerge when those criteria are applied. While it is true that his felony conviction occurred when he was much younger, that is about the only factor that weighs in his favor, despite his representations to the contrary in his Reply Brief. He entirely fails to address the criteria that greatly outweigh the limited evidence of his rehabilitation. Indeed, Oppenheim's record is notable for the number of criteria that constitute grounds for further investigation: (a) unlawful conduct; (c) misconduct in employment; (d) acts involving dishonesty, fraud, deceit or misrepresentation; (e) acts which demonstrate disregard for the rights or welfare of others; (g) abuse of legal process, including filing of vexatious or frivolous lawsuits; (h) neglect of financial responsibilities and neglect of professional obligations; (i) violation of an order of a court; (*l*) denial of admission to the bar in another jurisdiction on character and fitness grounds (which occurred less than a year before he applied for admission to the New Mexico Bar); (m) disciplinary action by a lawyer disciplinary agency or other professional disciplinary agency of any jurisdiction; and (n) making of false statements, including omissions, on bar applications in this state or any other jurisdiction. Indeed, fully 10 of the 14 criteria listed as warranting investiga-

tion by the Board are present in Oppenheim's background—and many are not in the distant past, as Oppenheim claims.

{35} Oppenheim further asserts that the evidence of his rehabilitation is "substantial"; his positive social contributions since the conduct are "very substantial"; his candor in the admissions process was "excellent"; and any omissions were "immaterial." These characterizations are less than credible. The only evidence Oppenheim produced of his rehabilitation was testimony from his psychologist; he provided little, if any, evidence of positive social contributions; both the Washington Board and New Mexico Board found that his candor in the admissions process was lacking; and he made several omissions that were highly material. Thus, even when we apply the more specific criteria contained in the amendment to Rule 15–103 to him, Oppenheim still falls far short of meeting the standards for character and fitness.

{36} Oppenheim compares himself to the applicant in *Schware v. Board of Bar Examiners of the State of N.M.*, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957), a man whose denial of admission to the Bar was reversed by the United States Supreme Court when that denial was predicated on the applicant's former membership in the Communist Party. The *Schware* Court discussed the good moral character standard and proper and improper factors to be considered in determining whether an applicant meets that standard.

A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment. A State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar, but any qualification must have a rational connection with the applicant's fitness or capacity to practice law. Obviously an applicant could not be excluded merely because he was a Republican or a Negro or a member of a particular church. Even in applying permissible standards, officers of a State cannot exclude an applicant when there is no basis for their finding that he fails to meet

these standards, or when their action is invidiously discriminatory.

*Id.* at 238–39, 77 S.Ct. 752 (footnote and cited authority omitted). Oppenheim's suggestion that he is somehow similar to the applicant in *Schware* misrepresents the facts, to say the least. Far from being based on "invidious discrimination" or pervasive societal bias, the Board's decision was based on Oppenheim's repeated deceitful, unlawful, and unprofessional behavior. The requirements of honesty, professionalism, and compliance with the law most certainly have a rational connection with Oppenheim's fitness to practice law; Oppenheim did not meet these qualifications. Indeed, two other professional boards in the State of Washington agreed, revoking Oppenheim's medical license and denying his admission to the Washington Bar.

**▇** {37} Oppenheim also argues that the rules requiring proof of good moral character violate his right to equal protection. His theory is that the Court's rules impermissibly differentiate between lawyers applying for admission to the Bar and those applying for readmission through the disciplinary process. The U.S. Supreme Court has ruled, however, that regulations governing admission to the Bar do not contravene the Equal Protection Clause of the Fourteenth Amendment provided that they have a rational connection with an applicant's fitness or capacity to practice law. *Schware*, 353 U.S. at 238–39, 77 S.Ct. 752; *see also Conn. v. Gabbert*, 526 U.S. 286, 291–92, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999) (holding that liberty component of Fourteenth Amendment's Due Process Clause "includes some generalized due process right to choose one's field of private employment, but a right which is nevertheless subject to reasonable government regulation"). This Court has followed that authority. *See In re Adams*, 102 N.M. at 732, 700 P.2d at 195 (noting that while standards of qualification must be rationally related to applicant's fitness or ability to practice law, this Court has previously rejected challenges of those standards based on equal protection and due process clauses of state and federal constitutions); *Lucius*, 84 N.M. at 386, 503 P.2d at 1164 ("There is no evidence that the standards set forth in *Schware* . . . , in either content or operational effect, operate to arbitrarily deprive Petitioner of due process of law, or to discriminate against Petitioner in a manner which would violate his right to equal protection of the law.").

{38} More fundamentally, Oppenheim has not shown any difference in the way the Court's rules treat bar applicants and attorneys in disciplinary proceedings. Under the Court's rules, the decision whether to admit an applicant to the Bar is highly dependent on the facts in that applicant's background, resulting in "an ad hoc determination in each instance." *Nall*, 98 N.M. at 175, 646 P.2d at 1239. Whether to permit an attorney to continue or resume the practice of law in the disciplinary context is likewise based on the merits of each case. *In re Treinen*, 2006–NMSC–013, ¶ 11, 139 N.M. 318, 131 P.3d 1282. The basic question in either context is whether an individual's practice of law will endanger the public or the reputation of the profession. Rule 15–103(C)(1); *In re Treinen*, 2006–NMSC–013, ¶ 11, 139 N.M. 318, 131 P.3d 1282; *see also In re Adams*, 102 N.M. at 732, 700 P.2d at 195. Although Oppenheim argues that he should be treated the same as four individuals who were readmitted after being disciplined, he fails to show that they and he are similarly situated, and thus fails to show dissimilar treatment.

{39} Finally, Oppenheim argues that the Court's rules impermissibly impose the burden of proving good moral character on the applicant. He acknowledges this Court's determination in *Nall* that the burden of proof is properly on the applicant. Moreover, he does not specify a basis in any constitutional provision, or any other law, for concluding that *Nall* was wrong in its allocation of the burden of proof. Instead, Oppenheim relies on a law review article discussing the "variability and contextual nature of moral behavior" and the difficulties of predicting future conduct "based on one or two prior acts committed under vastly different circumstances." Deborah L. Rhode, *Moral Character as a Professional Credential*, 94 Yale L.J. 491, 560 (1985). Professor Rhode ultimately concludes that "abandoning the enterprise has much to commend it. In essence, the bar would cease monitoring character for purposes of admitting attorneys or of disci-

plining nonprofessional abuses." *Id.* at 589. We do not agree.

{40} While it is true that the future cannot be predicted with certainty, that is no reason to abandon the character and fitness inquiry. The Board is charged with safeguarding the state's interest in the integrity of the legal profession, *see In re Adams,* 102 N.M. at 732, 700 P.2d at 195, and it must do the best it can to make determinations about an applicant's moral character based on the evidence available to it. In this case as in most, the Board looked to Oppenheim in the first instance to present information bearing on his character. It was not unconstitutional for the Board to expect him to do so. *See Nall,* 98 N.M. at 175–76, 646 P.2d at 1239–40 (reaffirming that standards of qualification must have rational connection with applicant's fitness or capacity to practice law, but that burden of proving good moral character is properly on the applicant); *Lucius,* 84 N.M. at 386, 503 P.2d at 1164 (rejecting due process challenge of Board's character and fitness standards); *see also Willner,* 373 U.S. at 107, 83 S.Ct. 1175 (Goldberg, J., concurring) ("While the vast majority of candidates are approved without difficulty, in exceptional cases, such as this, either information supplied by the applicant himself or material developed in the course of the committee's investigation gives rise to questions concerning the applicant's moral character.").

▮ {41} While we accept the Board's recommendation that Oppenheim not be granted admission to the Bar, we decline to accept the Board's recommendation setting a five-year limit on when Oppenheim may reapply for admission. We prefer not to specify any period of time by which Oppenheim could or could not reapply, but instead leave it to the specific facts and circumstances of any future case. In the event of another application that the Board feels may be premature, the Board can certainly bring the matter to this Court's attention at that time.

## ASSESSMENT OF ATTORNEY FEES

▮ {42} The Board found that Oppenheim was obligated to pay attorney fees and costs pursuant to Rule 15–105(A)(3) and assessed the total amount of $40,756.39. The Board determined that these costs and fees were reasonable and incurred in connection with the investigation and hearing of his application, noting in particular that the Board's counsel's fees were billed at the reduced rate of $75.00 per hour.

{43} Oppenheim challenges the Board's authority to assess charges for its attorney fees incurred in connection with the investigation and hearing on his applications for admission. While Oppenheim acknowledges that the Court's rules expressly authorize the Board to assess "reasonable additional expenses to be determined by the Board of Bar Examiners, in connection with any investigations or hearings," Rule 15–105(A)(3), he asserts that "unitemized expenses for attorney fees do not fit within the intent of this rule." Oppenheim contends that "there is no rule or policy establishing that attorney fees for the Board's own counsel are appropriate." We agree.

{44} Along with standard application fees, Rule 15–105(A) allows the Board to assess "reasonable additional expenses to be determined by [the Board], in connection with any investigations or hearings." The Rules governing Admission to the Bar do not provide any specific guidance as to what "additional expenses" may include. However, the Rules Governing Discipline list the types of costs that are permissible in a disciplinary proceeding against attorneys already admitted to practice. We find this list instructive as to the types of costs that are typically assessed in proceedings involving the fitness of both licensed attorneys and those seeking a license to practice law.

{45} This Court, or the Disciplinary Board in the case of formal reprimands, has the authority to assess "all costs incurred in a disciplinary proceeding" against an attorney who is determined to have violated the Rules of Professional Conduct. Rule 17–106(B) NMRA. These costs include, but are not limited to, "the cost of depositions, exhibits, transcripts, witnesses and the expenses of hearing committee members and members of the Disciplinary Board who participate in the proceedings." *Id.* Further, "the expenses

and costs of an investigation which were incurred in the handling of a disciplinary proceeding" may also be assessed against the attorney. *Id.* This Rule provides guidance in terms of what types of costs might be properly included in an assessment for a character and fitness hearing. The costs of a disciplinary hearing do not include legal fees for disciplinary counsel. Subsection (A) of that same rule provides that the annual salaries of disciplinary counsel are paid out of the annual disciplinary fees collected from all licensed attorneys. There is no analogous provision for the Board of Bar Examiner's counsel in a character and fitness hearing.

 {46} By way of an analogy, the recoverable costs set forth in Rule 17–106(B) for the Disciplinary Board are similar to the costs that are recoverable by a prevailing party in a civil suit. *See* Rule 1–054(D) NMRA. The Rules of Civil Procedure expressly exclude attorney fees from such recoverable costs. Rule 1–054(D)(1). As a general proposition, attorney fees are not recoverable costs absent some express provision to that effect. *See N.M. Right to Choose/NARAL v. Johnson,* 1999–NMSC–028, ¶ 9, 127 N.M. 654, 986 P.2d 450 (reiterating that New Mexico follows American Rule that absent statutory or other legal authority, parties are responsible for their own attorney fees); *Devous v. Wyo. State Bd. of Med. Exam'rs,* 845 P.2d 408, 418–19 (Wyo. 1993) (citing the American Rule and declining to interpret "costs" of disciplinary proceedings as allowed by medical disciplinary statutes and rules to include attorney fees).

{47} By way of another helpful analogy, we observe that Rule 15–302(B) NMRA, governing applications for reinstatement after voluntary withdrawal or suspension for nonpayment of bar fees expressly allows the Board to assess "attorneys fees," in addition to expenses and costs of the Board in connection with investigations and hearings. Thus, consistent with the general rule, attorney fees are recoverable when specifically authorized. In the absence of such express authority, the rules do not envision assessment of attorney fees, and Rule 15–105(A)(3) falls within that general proposition. Accordingly, we reject the Board's assessment of attor-

ney fees and remand this matter back to the Board to modify its assessment of reasonable expenses consistent with this Opinion.

## CONCLUSION

{48} Accepting the Board's recommendation, we hold that Petitioner has not carried his burden of demonstrating fitness for admission to the Bar.

{49} **IT IS SO ORDERED.**

WE CONCUR: EDWARD L. CHÁVEZ, Chief Justice, PAMELA B. MINZNER, PATRICIO M. SERNA, and PETRA JIMENEZ MAES, Justices.